UNITED STATES of America

v.

Alonzo AUSTIN, Appellant.

No. 75–1523.

United States Court of Appeals, Third Circuit.

Argued Nov. 17, 1975.

Decided March 31, 1976.

Roger A. Lowenstein, Federal Public Defender for the Dist. of N. J., Newark, N. J., for appellant.

Jonathan L. Goldstein, U. S. Atty., John J. Barry, Maryanne T. Desmond, Asst. U. S. Attys., Newark, N. J., for appellee.

Before VAN DUSEN, ADAMS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Defendant-appellant appeals from a ten-year imprisonment sentence of May 7, 1975, based on a jury verdict finding him guilty of attempting to take money of the National Newark and Essex Bank in violation of 18. U.S.C. § 2113(a) on December 18, 1972.[1] Defendant complains of inadequate jury instructions bearing on his insanity defense. Having carefully considered defendant's contentions, we affirm the district court judgment and commitment order of May 7, 1975.

Although defendant does not challenge either that the attempt to rob the bank in question was made by defendant or the sufficiency of the evidence to support the verdict, a statement of the historical facts is helpful to an understanding of defendant's contentions and the trial court's rulings.

Defendant was a paranoid schizophrenic. He had stabbed a female (Doris Anthony) in October 1972, stabbed a male (Hooker) in December 1972, at times acted abnormally, and sometimes complained of headaches. Austin was overheard mumbling and talking to himself on various occasions. Lorraine Baskerville testified that during the winter of 1972 Austin was acting in an extremely bizarre fashion.[2] In March of 1973, approximately the same time as his arrest for the attempted bank robbery,

---

1. The April 1973 indictment charged that he took such action "knowingly and wilfully and by force and violence and by intimidation."

2. On one occasion he came to the door of her apartment covered with mud with his pants ripped, claiming that men were plotting to get him and he had to escape from the plotters by climbing over fences which ripped his clothing. On another occasion he told Ms. Baskerville that 12 men had just run into her bedroom. Also she testified that Austin claimed to have

Austin once again attempted to injure Hooker with a pipe.[3]

Several times in 1972 defendant said he needed money and "I have got to get some money."[4] During the period of late 1972 defendant said to a friend, "I don't have any money, I am going to rob a bank" (N.T. 2.149 ff.). He planned ways of getting money and anticipated using a machine he had in his possession to print numbers on checks which he subsequently intended to cash and then leave the area quickly.

Prior to entering the bank, Austin put a bandage "on his face to hide the moles" (N.T. 2.66) so that he would not be recognized. A wool cap pulled down over his forehead covered another prominent mole. He directed the driver of a cab to take him to the National Newark and Essex Bank and to wait for him while he went in to cash a check.

Defendant walked into the bank carrying a bag. He presented a check to a teller at the money order window but, as she was not authorized to cash checks, she did not read it and told him to take the check to another teller. Austin walked to the window of Paul Pfeiffer and handed him the check. Pfeiffer read what was handprinted on the check ("I want $5000. I have a pistol, am desperate. Give me hundred, fifty, twenty dollar bills. Hurry"), looked at defendant and "figured he meant business" (G–1, 1.11). The handwritten portion of the check had been overwritten several times, making subsequent comparison of handwriting difficult, if not impossible. Surveillance photographs taken by a camera triggered by Pfeiffer indicated that defendant had likewise been careful to wear gloves, with the result that no latent fin-

gerprints of value were later found on the check. Calmly, and acting like a regular customer cashing a check, Austin told Pfeiffer to hurry. Although defendant was not carrying a gun, he had his hand in his pocket to make the teller believe otherwise. Pfeiffer dropped to the floor and pushed a second button to set off the general alarm for the police. Austin turned around, walked unnoticed out of the bank, got into the waiting cab, and drove off. Later, when he saw his picture in the newspaper, he laughed and said, "They didn't catch me" (3.85–3.86).

On March 13, 1973, agents of the Federal Bureau of Investigation went to 206 Howard Street, Newark, with a warrant for defendant's arrest. A woman let them into the apartment and the agents recognized Austin. He said his name was Nathaniel Harris and showed the agents identification in that name (2.43). He was transported to the FBI office after being informed that he was being charged with attempted bank robbery and signed an Advice of Rights form, which he acknowledged he understood. Initially Austin denied any knowledge of the attempted robbery, but when told that he had been identified by two bank employees and when confronted with the surveillance photograph taken at the bank during the attempt, he admitted the crime. He told the agents the details of the crime in question and the substance of his statement was reduced to writing. Defendant made and initialed a correction, wrote the last paragraph in his own handwriting and signed the statement. He appeared alert and perfectly normal, there being no indication that he was suffering from any mental disorder.

3. Another defense witness (the mother of Ms. Baskerville) testified that Austin told her about 1972 that someone was after him and she recommended that he see a doctor.

4. N.T. 2.47, 2.90, 2.147, 3.89–90. At N.T. 3.89 Mr. Hooker testified that in December 1972 the defendant said: "I got to make me some big money, I am going to get me some big money."

seen the candles moving at the apartment. Ms. Baskerville was with Austin and other persons at the Eureka Restaurant in Newark when Austin complained about the size of the portion of food given to him. After they left the restaurant, Austin attempted to burn the restaurant down by pouring gasoline in front of it. Austin stated to Ms. Baskerville that he wanted to kill his mother because she had left him in an orphans' home. Defendant told Ms. Baskerville that her brother James was plotting against him.

On May 22, 1973, defendant entered a not guilty plea and, by district court order of April 4, 1974, the court found that Austin "is presently so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense" and committed him "to the custody of the Attorney General . . . pursuant to 18 U.S.C. § 4246 until said defendant is mentally competent to stand trial . . . ."

After a hearing on January 21, 1975,[5] the district court found on February 4, 1975, that "Austin is presently competent so as to be able to understand the proceedings against him and to assist properly in his defense" and the trial commenced on April 4, 1975.

Although the defense's experts [6] testified that on December 18, 1972, Austin did not

have substantial capacity to conform his conduct to the requirement of the law proscribing attempted bank robbery due to mental defect or disease, the prosecution's experts testified, to the contrary, that he had such capacity to conform his conduct to the requirement of such law on that date.[7]

Since the defendant bases this appeal on alleged inadequacies of the jury charge (page 32 of appellant's brief), we turn to the alleged errors in the charge.

## I.

■ Defendant first objects to a portion of the charge which was included at the request of the prosecution and concerned the relationship between the defendant's motive and intent in committing the crime. This portion of the charge is set out in the margin.[8] Prior to giving this part of the

---

5. The court received, on or before this hearing, reports of Doctors Godfroy and Snow, Staff Psychiatrists, and by John Reisenleiter, Staff Psychologist, at the Springfield, Mo. Medical Center for Federal Prisoners, as well as testimony of Psychologist Reisenleiter.

6. Clinical Psychologist Fink examined Austin in February 1975, Dr. Brancale in December 1973 and January 1974, and Dr. Kern in January 1975.

7. N.T. 4.64–65, 4.74, 4.79, 4.93, 4.96, 5.14, 5.20 and 5.24. Dr. Campean, acting medical director of the Diagnostic Center at Menlo Park, N.J., examined defendant in December 1973 and January 1974, Psychologist Reisenleiter in November 1974, and Dr. Feldman on February 11, 1975. In spite of extensive cross-examination, Dr. Campean repeated his opinion that a law-abiding paranoid schizophrenic, who would stab people, could control his activity in a law-abiding way to accomplish his objectives and that defendant had the capacity to control his conduct so as not to attempt to rob the bank. Dr. Feldman testified that defendant was not insane on December 18, 1972, and he committed the illegal act having the capacity to conform his actions to society's standards. Also, this witness stated that Austin's behavior in the bank was rational.

8. This portion of the charge, with defendant's emphasis, has been set forth as follows in defendant's brief at pages 33–34:

"I have said that a criminal defendant who is insane at the time of the commission of the criminal offense lacks the requisite criminal

intent to commit the crime. You have also heard testimony concerning the defendant's motive in committing the crime.

"Intent and motive should never be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted. "Personal advancement and financial gain are two well-recognized motives for much of human conduct. These laudable motives may prompt one person to voluntary acts of good, another to voluntary acts of crime. *So, too, delusional motives may prompt one person to act voluntarily in a criminal manner.* "*A delusional motive alone is never a defense where the act done or omitted is a crime.* So, the motive of the accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent." (N.T. 6.81–82)

This request for charge was based on Section 13.05 of Federal Jury Practice and Instructions, by Devitt & Blackmar (2d ed.).

The dissent suggests (page 889) that, but for the second emphasized sentence quoted from the charge above, the jury may well have returned a verdict of not guilty based on a finding of delusional motivation. However, if the jury found the prosecution's experts more credible than those of the defense, a finding of delusional motivation would not have necessarily led to the conclusion that Austin was therefore unable to conform his conduct to the law even without the instruction. The dissent eliminates the second step in a logical progression: step 1, delusional motivation; step 2, hence, inability to conform one's conduct to the law; step 3,

charge, the trial judge had made clear that in order to establish that defendant had committed the offense charged in the indictment, the prosecution was "required" to prove four essential elements of the crime, two of which were:

"*Third:* That the defendant acted wilfully.

"*Fourth:* Defendant was sane at the time of the *offense.*"

The court pointed out that evidence of his mental state, both before and after December 18, 1972, was relevant and that "a criminal defendant who is insane at the time of the commission of the criminal offense lacks the requisite criminal intent to commit the crime." Concerning the issue of sanity [9] and intent, the court used this wording in the charge:

"There are two questions to be presented by [sic] you after hearing the testimony of the psychologists and psychiatrists, and other witnesses.

"First. Did the defendant suffer from a mental defect or disease on December 18, 1972. In deciding this question you may consider evidence of his mental state both before and after that time. If he did, then the next question is did that mental defect or disease so incapacitate him that he lacked substantial capacity to conform his conduct to the requirements of the law against attempted bank robbery.

"Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind. It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.

"I have said that a criminal defendant who is insane at the time of the commission of the criminal offense lacks the requisite criminal intent to commit the crime. You have also heard testimony concerning the defendant's motive in committing the crime."

It was at this place in the charge that the court explained the difference between intent and motive, using the language in note 8.

We note that the last *italicized* sentence of this portion of the charge objected to by defendants (see note 8) is modified by the final sentence quoted in the note 8 above, which makes clear that motive (delusional or otherwise) may be considered in determining "state of mind or intent."

We have concluded that there are several reasons why the giving of this instruction was not reversible error:

A. The district court made clear that defendant's alleged, delusional motives were relevant in determining whether the defendant acted with the necessary wilfullness and intent. The trial judge directed the jury to consider all the evidence of defendant's mental state at several places in the charge.[10]

---

9. The instructions on sanity were amplified at N.T. 6.82.

10. The charge included this language, as well as that referred to above at page 883.

". . . intent may be inferred from statements made and acts done or omitted by the accused and by the victim as well and from all the surrounding circumstances shown by the evidence in the case." [N.T. 6.75]

"For the purpose of throwing light upon the mental condition of the accused at the time of the alleged offense, the jury may

hence, a verdict of not guilty by reason of insanity.

consider evidence of his mental state both before and after that time." [N.T. 6.82]

"[C]onsider the evidence that has been admitted as to the defendant's mental condition before and after the offense charged, the two stabbings, the attempted assault with a pipe, the attempted fire setting, and other testimony of his mental condition between December 1972 and March 1973.

"The evidence as to the defendant's mental condition before and after the date of the attempted bank robbery December 18, 1972 was admitted solely for the purpose of assisting you to determine the defendant's condi-

B. The trial judge was entitled to make clear to the jury that the motives with which a defendant acts, even though of idealistic or compulsive [11] origin, do not constitute a defense to conduct determined by Congress to be criminal. See *Standard Sanitary Mfg. Co. v. United States,* 226 U.S. 20, 49, 33 S.Ct. 9, 15, 57 L.Ed. 107, 117 (1912); *United States v. Cullen,* 454 F.2d 386, 390–92 (7th Cir. 1971), opinion by Mr. Justice Stevens, then a Circuit Judge; *United States v. Moylan,* 417 F.2d 1002, 1009 (4th Cir. 1969). In the *Standard Sanitary Mfg.* case, the Court said at page 49, 33 S.Ct. at page 15, 57 L.Ed. at page 117:

> "Nor can [laws] be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and, it may be, of some good results."

C. Defendant's contention that this language of the charge violated "the spirit and intent" of *United States v. Currens,* 290 F.2d 751 (3d Cir. 1961), is rejected. The defendant was not restricted in offering evidence of background facts and many such facts were presented to the jury. The wording of the charge concerning the sanity issue suggested by defendant was included in the charge of the court, is set forth in the margin,[12] and is fully consistent with *Currens,* where Senior Judge Biggs (then Chief Judge) said at page 774:

> "... The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated."

D. The objection made by defense counsel to two sentences of the entire ten-sentence charge on motive was not

---

tion on the date of the alleged offense." [N.T. 6.84]

"[Y]ou should consider the testimony of each [expert] witness in connection with the other evidence in the case and . . . give that testimony such weight as you believe it is fairly entitled to receive." [N.T. 6.85]

"You should, however, consider it together with all the other evidence in the case in determining defendant's mental condition at the time of the commission of the crime charged in the indictment." [N.T. 6.80]

11. See *United States v. Cullen,* 454 F.2d 386, 391 note 12 (7th Cir. 1971), citing a case stating that "the compulsion must be present, immediate and impending, and of such a nature as to induce a well founded fear of death or at least serious bodily injury" in order to provide an excuse for crime.

12. "I further instruct you, under the defendant's plea of not guilty there is as you know an issue as to his sanity at the time of the alleged offense. The law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime.

"The sanity of the defendant at the time of the commission of the alleged offense is an element of the crime charged and must be established by the government beyond rea-

sonable doubt, just as it must establish every other element of the offense charged.

"A defendant is insane within the meaning of these instructions if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity to conform his conduct to the requirements of law.

"As used in these instructions, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

"For the purpose of throwing light upon the mental condition of the accused at the time of the alleged offense, the jury may consider evidence of his mental state both before and after that time. The material issue, however, is whether the defendant was sane or insane at the time of the alleged criminal conduct.

"If the evidence in the case leaves you with a reasonable doubt as to whether the defendant was sane at the time of the alleged offense, you will find him not guilty, even though it may appear that he was sane at earlier and later times.

"In considering the mental state of the accused, the jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

sufficiently specific. See *United States v. Butler,* 446 F.2d 975, 977 (10th Cir. 1971). Defense counsel objected to the sentence reading "Delusional motive is never a defense where the act done or omitted is a crime" (N.T. 6.3). The court responded at N.T. 6.4:

"You're arguing as to that one particular sentence.

"To repeat, I said you just can't take that one particular sentence out of the request itself.

"You have got to read the request in its entirety."

Defense counsel then objected to another sentence of the requested charge,[13] which was designed to cover the prosecution's contention that a paranoid schizophrenic who was law-abiding might go to the authorities to get help and funds needed for escape from an area where his delusions led him to believe he was being persecuted and threatened, whereas such a schizophrenic who voluntarily engaged in criminal activities might turn to criminal activities for such help and funds.[13] Defense counsel never submitted a revision of the prosecution's request for charge on motive and intent which it suggested the court give. *Cf. United States v. Butler, supra* at 977.

Under the circumstances, we hold that these ten sentences of the charge, when considered with the charge as a whole, did not constitute reversible error. See *United States v. Heavlow,* 468 F.2d 842, 844 (3d Cir. 1972).

**13.** This second sentence of the ten-sentence requested charge to which objection was made provided: "So, too, delusional motives may prompt one person to act voluntarily in a lawful manner and another person to act voluntarily in a criminal manner." For example, Dr. Kern, a defense expert, had testified on cross-examination, concerning a hypothetical paranoid schizophrenic:

"Q. And if he had a mind to go out and steal to get that car, certainly the fact that he is a paranoid schizophrenic would not be an excuse for the theft?

"A. That's right.

## II.

Next defendant objects to the inclusion of this sentence in the charge as "circumscribing the evidence of insanity":

"As used in these instructions the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (N.T. 6.82)

This sentence was included in the instructions specifically requested in writing by defense counsel. See last complete sentence on page 1 of Document 33 in Crim. No. 263–73, D.N.J. Furthermore, we agree with the prosecution that this language, due to use of the word "only," instructed the jury that such conduct alone does not constitute mental disease or defect. The jury was permitted to consider criminal or anti-social conduct along with other conduct indicating mental disease or defect. The court instructed the jury that evidence as to mental condition included, *inter alia,* "the two stabbings, the attempted assault with a pipe, the attempted fire setting and other testimony of his mental condition . . ." Also, this instruction was expressly approved in *Currens, supra* at 774, note 32.

For the foregoing reasons, this contention is rejected.

## III.

Finally, defendant contends that it was plain error under F.R.Crim.P. 52 for the trial court not to charge on the consequences of a finding by the jury of insanity "and/or the province of the court and jury in determining the disposition of the defendant." [14]

"Q. So I take it then that the way you relate the mental disease in this case to the legal standard, that is, the absence of substantial capacity to conform his conduct, is because his motivation was delusioned?

"A. That's right, mainly."
(N.T. 4.37).

**14.** Defense counsel contends that defendant was entitled at the least to the standard instruction that the jury should not give any consideration to the matter of punishment in determining the guilt or innocence of the accused, see Devitt & Blackmar, Federal Jury Practice and Instructions (2d ed.) § 10.01 at

We have concluded that the failure to give such an instruction, first requested on appeal, is not plain error on this record. Furthermore, this court has recently considered the refusal of a trial judge to give an instruction that it was likely that a civil commitment would result from a verdict of not guilty by reason of insanity in a criminal case where the insanity defense was raised, and adheres to its decision affirming the trial judge in that case for the reasons so well stated by Judge Gibbons in *United States v. Alvarez*, 519 F.2d 1036, 1047–48 (3d Cir. 1975).

The judgment of the district court will be affirmed.

ADAMS, Circuit Judge (dissenting).

The major, and indeed the sole, issue in this case is whether the government proved that the defendant had the capacity to conform his conduct to the requirements of the law at the time of the alleged crime. My reading of the portion of the charge submitted to the jury by the district court concerning the relationship of the delusional motivation of the defendant to his conduct differs from that of the majority. In my view, the presence of an incorrect statement of law and the confusing nature of the charge tainted it sufficiently to preclude affirmance of the judgment. It is for that reason that I respectfully dissent.

### A.

The function and meaning of the insanity defense in the present day are best understood against the backdrop of its historical development. This is particularly so here, where the interpretation of the jury charge is, in my judgment, most appropriately made with reference to the broader societal and criminological aspects of the insanity defense.

Until the thirteenth century, mental disease or lack of mental capacity was not a defense in a criminal case.[1] Then, as the law "moved from a concept of strict liability to one based on fault," the notion developed that guilt includes a mental element. This evolution, tied to the influence of canon law in the ecclesiastical courts, led to a new concern with moral guilt, and slowly to the whole concept of mens rea.[2] Exculpation on the ground of insanity first appeared in the late thirteenth century, when Henry III began a practice of pardoning those he believed insane. During the succeeding reign of Edward I, the royal pardon became a routine matter in cases involving the conviction of a defendant who was "mad" when he committed the crime.[3]

The courts ultimately responded to the regular invocation of the royal pardon by adopting insanity as a defense to a criminal charge.[4] It was one of a set of defenses based upon the absence of the criminal intent that was by then an established element of certain crimes.[5] "And when the law began to take notice of insanity as a legal defense to a criminal charge it was on the theory that one who was insane had *no mind* and hence could not have mens rea."[6] By the sixteenth century, the insanity defense was an accepted part of the criminal law.[7]

Through the eighteenth century, a defense of insanity would lie only if the de-

page 187 and § 17.08 at page 321, or this instruction given in *Pope v. United States,* 372 F.2d 710, 732 (8th Cir. 1967):
    " 'Just as you will discharge your duty under the law and the evidence you can assume that others will do the same as to any matters for their consideration.' "

1. R. Perkins, Criminal Law 738 (1957); Gray, *The Insanity Defense: Historical Development and Contemporary Relevance,* 10 Am.Crim.L. Rev. 559, 562 (1972); Sayre, *Mens Rea,* 45 Harv.L.Rev. 974, 1004 (1932).

2. Gray, *supra* at 560; Sayre, *supra* at 982–83.

3. R. Perkins, *supra* at 738; Gray, *supra* at 562 and n.13; Sayre, *supra* at 1004–05.

4. Gray, *supra* at 562; Sayre, *supra* at 1005.

5. Gray, *supra* at 561. *See* Sayre, *supra* at 1004–16.

6. R. Perkins, *supra* at 739 (emphasis in original).

7. Gray, *supra* at 562.

fendant was totally deprived of reasoning ability, understanding, or memory, so that there was no possibility that he had mens rea.[8] In time, this rigid rule too began eroding, its demise most clearly marked by the acceptance in *Hadfield's Case*[9] of insane delusions as a defense to a charge of attempting to assassinate the King.[10] The development of the insanity defense in Britain, insofar as it has relevance to the American situation, was capped in *M'Naghten's Case.* There the House of Lords ruled that the insanity defense applies if the defendant "was labouring under such a defect of reason, from a disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."[11]

The standard set out in *M'Naghten* remained the basic rule of British and American courts for a century.[12] Subsequent developments in this country, through the adoption of the controversial *Durham* "product" formulation in the District of Columbia Circuit[13] and of the *Currens* rule by this Court,[14] are too well known to require repetition.[15]

The historical narrative of the unfolding of insanity as a defense to a criminal charge highlights its contemporary function and usefulness. It is still connected, as it was in its incipiency, to the absence of mens rea. Without the required mental element, the law will not normally recognize criminality[16] or countenance punishment. The insanity of the defendant is said to demonstrate the absence of the mental element.[17] Closely related, and also tied to the common law growth of the defense, is the belief that the criminal sanction should not be imposed on one who is not morally blameworthy; an insane person, acting without criminal intent or volition, is not culpable in that sense.[18] Finally, the insanity defense recognizes a deterrent theory of the criminal law. A defendant who is insane, and therefore is unable to control his behavior, so goes the argument, cannot be deterred by punishment. Since punishment will serve no deterrent purpose, it ought not be meted out.[19]

Of course, an acquittal by reason of insanity does not mean that the defendant will necessarily go free. A defendant who is found not guilty by reason of insanity in a federal case is released, but with the

---

**8.** R. Perkins, *supra* at 740; Gray, *supra* at 562–63; Sayre, *supra* at 1005.

**9.** 27 How.St.Tr. 1281 (K.B. 1800).

**10.** Gray, *supra* at 564.

**11.** 10 Cl. & F. 200, 210, 8 Eng.Rep. 718, 722 (H.L. 1843).

**12.** Gray, *supra* at 567.

**13.** *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

**14.** *United States v. Currens,* 290 F.2d 751 (3d Cir. 1961).

**15.** *See, e. g., United States v. Brawner,* 153 U.S.App.D.C. 1, 471 F.2d 969, 972–81 (1972); *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862, 869–75 (1954); Diamond, *From M'Naghten to Currens, and Beyond,* 50 Calif.L. Rev. 189, 190 (1962); Gray, *supra* at 567–72.

**16.** The exception, of course, is the so-called regulatory or public welfare offense. *United States v. Dotterweich,* 320 U.S. 277, 280–81, 64 S.Ct. 134, 136, 88 L.Ed. 48, 51 (1943); *United States v. Balint,* 258 U.S. 250, 251–52, 42 S.Ct. 301, 302, 66 L.Ed. 604, 605 (1972). See the lengthy discussion of the problem in *Morisette v. United States,* 342 U.S. 246, 250–63, 72 S.Ct. 240, 243–49, 96 L.Ed. 288, 293–300 (1952).

**17.** *Budd v. California,* 385 U.S. 909, 912–13, 87 S.Ct. 209, 210, 17 L.Ed.2d 138, 139 (1966) (Fortas, J., dissenting from denial of cert.); R. Perkins, *supra* at 739; Keedy, *Insanity and Criminal Responsibility,* 30 Harv.L.Rev. 535, 538–39, 546–48 (1917).

**18.** *Overholser v. Lynch,* 109 U.S.App.D.C. 404, 288 F.2d 388, 393 (1961) (en banc), *rev'd on other grounds,* 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *Durham v. United States,* 94 U.S.App.D.C. 228, 214 F.2d 862, 876 (1954); Monahan, *Abolish The Insanity Defense?—Not Yet,* 26 Rutgers L.Rev. 719, 729 (1973); Sayre, *supra* at 1004.

**19.** *United States v. Currens,* 290 F.2d 751, 773 (3d Cir. 1961); Davis, *Some Aspects of the Currens Decision,* 35 Temp.L.Q. 45, 46 (1961).

expectation that State authorities will commence civil commitment proceedings.[20]

## B.

The formulation of the test for the insanity defense in this Court was set out in *Currens* fifteen years ago. As stated by then-Chief Judge Biggs, *Currens* prohibits the jury from finding the defendant guilty if it is "satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated."[21] Put another way, *Currens* requires that the defendant be found not guilty by reason of insanity if, once the issue of sanity is raised, the government fails to prove that when he committed the prohibited act, the defendant had substantial capacity to conform his conduct to the requirements of the law. The *Currens* standard has been undeviatingly adhered to by this Court since its adoption,[22] and its continuing viability is not questioned today. Consequently, the issue before us is whether the charge given to the jury complied with the strictures of *Currens*.

The two critical sentences in the ten-sentence portion of the jury charge challenged by Austin are as follows: "A delusional motive alone is never a defense where the act done or omitted is a crime. So, the motive of the accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent." Through his counsel, Austin objected strongly to that portion of the charge. The basis of the objection, which is pursued vigorously in this Court, is that the presence of these two sentences transgressed the standards established in *Currens*, and that the conviction therefore must be reversed. The government emphasized in its summation in the trial court that delusional motivation is not a defense to a criminal act, and continues in this Court to contend that the instruction was not erroneous. Resolution of the disagreement is of the utmost importance, since, although other arguments are presented by Austin, these two sentences from the jury charge are at the heart of the appeal.

On the basis of its review of the whole charge and its comparison of the charge with *Currens*, the majority holds that the sentences questioned do not constitute reversible error. I cannot agree.

Three lay witnesses and five expert witnesses testified that Austin had a paranoid belief that certain people were plotting to "get" him and were coming after him. Austin's fear of being chased and caught was described by several of the expert witnesses as a delusional motivation that led him to conclude that he needed money in order to escape his pursuers, and further to believe that it was necessary for him to rob a bank in order to secure the money.

While it would thus appear that Austin intended to take money from the bank, the jury could have concluded—with reference to the *Currens* test—that the government still had not proven that Austin had substantial capacity to conform his behavior to the requirements of the law. In fact, one expert witness described Austin's behavior at the time of the attempted bank robbery in exactly those terms. The jury could have reached this result if it believed that Austin's delusions were so strong that they overcame his ability to control his behavior,

---

**20.** *United States v. Alvarez*, 519 F.2d 1036, 1048 (3d Cir. 1975). In the District of Columbia, a defendant who is found not guilty by reason of insanity is automatically committed, although he must be granted a hearing within 50 days of his confinement for a determination of his eligibility for release. D.C.Code § 24–301(d) (1973).

**21.** 290 F.2d at 774. The courts of appeals have not adopted a uniform test for the insanity defense. The variations are described in *Unit-*

ed States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 973, 979–81 (1972).

**22.** The test has been applied by this Court in *Government of the Virgin Islands v. Bellott*, 495 F.2d 1393 (3d Cir. 1974); *United States v. Lutz*, 420 F.2d 414 (3d Cir. 1970) (per curiam); and *United States v. Benus*, 305 F.2d 821 (3d Cir. 1962) (per curiam). *See also United States v. Alvarez*, 519 F.2d 1036, 1041–42 (3d Cir. 1975).

and that he could not conform his conduct to the law. Had the jury chosen to take this route, acquittal would have followed.

Acquittal may not have served the first rationale of the insanity defense—punishing only those who act with criminal intent—since Austin did intend to rob the bank. But it would have been consistent with the remaining rationales—avoiding punishment for those who are not morally blameworthy for their acts or for those who are not deterrable. In any event, an acquittal would have been consistent with the rule laid down in *Currens.*

In the first sentence of the two that are quoted from the charge—"A delusional motive alone is never a defense where the act done or omitted is a crime."—the jurors were in essence advised not to consider Austin's motivation if they believed such motivation was delusional in nature. Yet, as just shown, a finding of motivation of that kind may well have led to a verdict of not guilty. Accordingly, that sentence of the charge would seem to be incorrect as a matter of law. The district court should not have taken from the jury the right to connect Austin's delusional motivation with his ability or inability to conform his behavior to the law, and to find lack of criminal culpability under *Currens* if it chose.

The second of the quoted sentences—"So, the motive of the accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent."—appears to contradict the first. It is not an incorrect statement, but its conjunction with the preceding sentence, at the very least, may have confused the jury.

In addition to the incorrect and confusing portion of the charge, the district court gave the jury a correct charge, tracking the language of *Currens* [23] and providing the jury with other correct statements of applicable legal principles. I recognize that the propriety of a jury instruction is generally to be assessed by viewing the charge as a whole.[24] But I must conclude that, in the circumstances of this case, the charge was nonetheless so sullied by the two sentences just described that reversal of the judgment ought to ensue.

Decisions of both the Supreme Court and this Court establish that a conviction in a criminal case cannot stand if the charge to the jury was misleading. The major Supreme Court opinion setting out the rule is that of Justice Frankfurter, writing for the Court in *Bollenbach v. United States.*[25] That case involved a supplementary instruction given to the jury in a prosecution for conspiracy and for transportation of securities in interstate commerce, knowing them to have been stolen. After the jury had been out for seven hours, and found itself totally deadlocked, it asked the trial court for further instructions. In response, the court ultimately stated that if the defendant possessed the bonds in one state shortly after they were stolen in another, the jury could presume that he had stolen them and had transported them across state lines. The jury retired, and returned in five minutes with a verdict of guilty. The Supreme Court held that the instruction had been "simply wrong," stating flatly that "[a] conviction ought not to rest on an equivocal direction to the jury on a basic issue. . . A charge should not be misleading." [26]

In reversing a conviction later in the same term, in *M. Kraus & Bros., Inc. v. United States,*[27] a plurality of the Court

---

**23.** Such an approach would appear to be mandated by the decision in *Government of the Virgin Islands v. Bellott*, 495 F.2d 1393, 1397 n.3 (3d Cir. 1974).

**24.** *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373 (1973); *Boyd v. United States*, 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857, 858 (1926); *United States v. Heavlow*, 468 F.2d 842, 844 (3d Cir. 1972), *cert. denied*, 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973).

**25.** 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946).

**26.** *Id.* at 613, 66 S.Ct. at 405, 90 L.Ed. at 355. *Accord, Estep v. United States*, 327 U.S. 114, 115, 66 S.Ct. 423, 424, 90 L.Ed. 567, 569 (1946) (Frankfurter, J., concurring in the result).

**27.** 327 U.S. 614, 66 S.Ct. 705, 90 L.Ed. 894 (1946).

grounded its opinion in the *Bollenbach* rule. The Justices reasoned that although the charge contained correct portions as well as incorrect ones, the former "were so intertwined with the incorrect charge as to negative their effect." [28]

These Supreme Court precedents have been followed by this Court in a number of cases. In *Government of the Virgin Islands v. Carmona*,[29] the trial judge refused to instruct the jury that it could not convict the defendant unless it found that he had specific intent to commit the crime. Emphasizing that specific intent was an element of the crime, the Court reversed, since "an instruction must fairly set forth all of the essential elements of the crime charged." Further reliance was placed upon the Supreme Court's decision in *Bollenbach* for the broad proposition that "a misleading instruction is reversible error." [30] The same result, in the context of an erroneous instruction concerning entrapment, the primary defense used at the trial, was reached in *United States v. Meade*.[31] In *United States v. Silver*,[32] the

intermixture of correct instructions with the incorrect, where they described the defendant's sole defense, was held sufficient error to require reversal.

The doctrine established in these cases should govern the disposition of the matter now before us. The sanity of the defendant in a criminal case is an element of the crime, and, once put in issue by the defendant, must, at least in a federal prosecution, be proven beyond a reasonable doubt by the government.[33] Thus, in this case, sanity was an issue "basic" to the prosecution, in the sense contemplated in *Bollenbach*.[34] Heed should also be paid to the principle articulated by this Court in *Carmona*—that the jury instructions concerning the elements of the offense must be given with particular care. Further, it should be borne in mind, as set forth in *Meade*, that error in that portion of the charge describing the one defense relied upon at trial may lead to reversal. The reasons expressed by this Court for its decisions in those two cases are squarely applicable to Austin's appeal. In addition, the incorrect and confusing

**28.** *Id.* at 627, 66 S.Ct. at 710, 90 L.Ed. at 901 (Murphy, J., announcing the judgment of the Court).

**29.** 422 F.2d 95 (3d Cir. 1970).

**30.** *Id.* at 99.

**31.** 491 F.2d 592, 594–95 (3d Cir. 1974). *Cf. United States v. Alvarez*, 519 F.2d 1036, 1048 (3d Cir. 1975) (district court's failure to give a particular charge is not reversible error where the charge would have been incorrect).

**32.** 457 F.2d 1217, 1219 (3d Cir. 1972).

**33.** *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970); *Davis v. United States*, 160 U.S. 469, 486–88, 16 S.Ct. 353, 357–358, 40 L.Ed. 499, 505–506 (1895); *Government of the Virgin Islands v. Bellott*, 495 F.2d 1393, 1396 (3d Cir. 1974); *United States v. Currens*, 290 F.2d 751, 761 (3d Cir. 1961). *Davis* was based upon the Supreme Court's supervisory power over criminal procedure in the federal courts, not upon constitutional grounds. *Mullaney v. Wilbur*, 421 U.S. 684, 696, 95 S.Ct. 1881, 1897, 41 L.Ed.2d 508, 516 (1975); *Leland v. Oregon*, 343 U.S. 790, 797, 72 S.Ct. 1002, 1006, 96 L.Ed. 1302, 1308 (1952). The Court therefore held in *Leland* that the *Davis* rule was not applicable to prosecutions in state courts,

343 U.S. at 797, 72 S.Ct. at 1006, 96 L.Ed. at 1308, although the decision in *Mullaney* casts serious doubt upon the continuing vitality of *Leland*. *See* Note, *The Supreme Court, 1974 Term*, 89 Harv.L.Rev. 47, 53 (1975).

**34.** *See* 326 U.S. at 613, 66 S.Ct. at 405, 90 L.Ed. at 354. The importance of that portion of the jury charge dealing with elements of the offense is highlighted by the opinion of a plurality of the Supreme Court in *Screws v. United States*, 325 U.S. 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). The trial court in that case had given an instruction that incorrectly stated an element of the offense charged. No objection had been raised at trial, which would normally have prohibited the appellate court from addressing arguments based upon the jury charge. But the plurality of the Supreme Court declared that "where the error is so fundamental as not to submit to the jury the essential ingredients of the only offense on which the conviction could rest, we think it is necessary to take note of it on our own motion." *Id.* at 107, 65 S.Ct. at 1038, 89 L.Ed. at 1506. (Douglas, J., announcing the judgment of the Court). If such an error is so fundamental that it can be recognized on appeal as plain error, *see* Fed.R. Crim.P. 52(b), it surely is a basic issue in the prosecution.

portion of the jury charge appears to have been closely associated with the correct segment, a situation that led to reversals in both *Kraus* and *Silver.*

Application of the *Bollenbach* doctrine is particularly compelling when the misleading instruction involves insanity, since it is only upon proof of the sanity of the defendant that the right of the government to invoke the criminal sanction rests. The scope of the criminal law is circumscribed by its intersection with the insanity defense and the rationales that historically and contemporaneously undergird the defense. Where a jury cannot say that the defendant was capable of forming the intent to commit the alleged crime or that he was morally blameworthy for his conduct, or where imposition of a penalty would not have any deterrent effect, punishment is not appropriate. In my view, the jury in this case was not given an unfettered opportunity to make that determination.[35]

Accordingly, I would reverse the judgment of the district court and remand the matter so that a jury might determine, pursuant to a charge that is free from both doubt and error, whether the government has proven beyond a reasonable doubt that the defendant had substantial capacity to conform his conduct to law at the time of the alleged crime.

---

**35.** It is difficult to square the result reached by the majority today with this Court's recent decision in *Government of the Virgin Islands v. Toto,* 529 F.2d 278 (3d Cir. 1976). The Court there held that a trial judge's extensive curative instruction to the jury on the improper introduction of impeachment evidence—evidence not implicating an element of the offense—was insufficient to overcome the prejudice caused by the erroneously admitted evidence. Based on that line of reasoning, the judgment of conviction was reversed. The error that occurred in Austin's trial seems more pronounced, and thus makes out a stronger case for reversal. Not only did the error concern an element of the offense, which is critical in itself, but it emanated from the trial judge, not just from the prosecutor, and was given shortly after the government had emphasized the same point in its summation. We must not forget that "the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling," *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841, 846 (1894), and that "jurors are ever watchful of the words that fall from him." *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354 (1946).