UNITED STATES of America

v.

James A. FISHER, III, Appellant.

No. 93–7002.

United States Court of Appeals,
Third Circuit.

Argued Oct. 25, 1993.

Decided Nov. 10, 1993.

James A. Zurick (argued), Shamokin, PA, for appellant.

James J. West, U.S. Atty., Frederick E. Martin (argued), Asst. U.S. Atty., Lewisburg, PA, for appellee.

Before: BECKER, ALITO, and ROTH, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge:

Following a jury trial, James A. Fisher, III was convicted on three counts of transmitting threatening communications in interstate commerce, in violation of 18 U.S.C. § 875(c). On appeal, Fisher contends that the trial court erred (1) in denying his request shortly before the commencement of trial for a further continuance to obtain additional testing relating to his insanity defense, (2) in refusing to grant a mistrial when the prosecutor asked a particular question and the witness made an unsolicited reference to a prior prosecution of Fisher, and (3) in refusing to instruct the jury regarding the consequences of a verdict of not guilty by reason of insanity. We hold that the trial court did not err in its disposition of these matters, and we therefore affirm Fisher's conviction.

### I.

In January 1989, a judge of the United States District Court for the Western District of Wisconsin received a letter threatening the sexual assault and murder of that judge and another district court judge in the same district. Although the letter itself was unsigned, the upper left corner of the envelope bore Fisher's name and his mailing address at the United States Penitentiary at Lewisburg, Pennsylvania. In late May and early June 1989, similar threatening letters were received by a judge of the United States District Court for the Southern District of California and the Clerk of the United States District Court for the Eastern District of Virginia.

As a result of these letters, Fisher was indicted in May 1991 on three counts of sending threatening communications in interstate commerce. In July of that year, he entered a plea of not guilty, and his trial was initially scheduled for September. In August, Fisher filed notice of his intent to raise an insanity defense. At the same time, he also submitted requests for the appointment of an expert to provide psychiatric assistance to the defense and for a trial continuance until after October 17. The court granted these requests and continued the trial until November 12. On November 1, Fisher moved for a trial continuance until February 1992 so that his psychiatrist could secure background information about him. The judge once again granted the request and continued the trial until February 12. On January 29, 1992, Fisher filed his expert

psychiatric report as required by 18 U.S.C. § 4246(b). The report, authored by Dr. Abrahm Hostetter, a psychiatrist, diagnosed Fisher as suffering from "organic personality syndrome."

After receiving this report, the prosecution filed motions for psychiatric evaluations of Fisher pursuant to 18 U.S.C. § 4241(a) (competency) and 18 U.S.C. § 4242(a) (sanity). The court granted these motions and postponed the trial until April 6. On March 30, the prosecution sought an additional postponement because the court-ordered evaluations had not been completed, and the district court granted a trial continuance until May 4. After Fisher filed an additional motion for a continuance, the court scheduled a competency hearing for May 22 and scheduled jury selection for June 1.

Following the presentation of evidence at the competency hearing on May 22, Fisher's counsel sought an additional continuance so that tests such as an electroencephalogram (EEG), computerized axial tomography (CAT), and magnetic resonance imaging (MRI) could be performed to determine whether Fisher had any organic brain damage. The judge stated that he was reluctant to grant the request because of the delay that had already occurred. Instead, it was agreed that the prosecution would ascertain whether the Bureau of Prisons could arrange for the tests to be performed prior to trial.

Jury selection began on June 1, and the trial commenced on June 8. At that time, the prosecution informed Fisher's counsel that the Bureau of Prisons had been unable to arrange for the requested tests within the time provided. Fisher's attorney again requested a continuance, but the district court denied the request.

At trial, the defense did not dispute the fact that Fisher had sent the threatening letters but instead maintained that Fisher was insane. The defense expert, Dr. Hostetter, testified that Fisher suffered from organic personality syndrome. Acknowledging that this diagnosis required evidence of organic brain damage, Dr. Hostetter concluded that Fisher had suffered such damage at some point in his life. Although Dr. Hostetter stated that he could not be certain what

had caused the damage, he noted that Fisher had reported being hospitalized for pneumonia as a child, and Dr. Hostetter stated that a high fever resulting from that illness could have caused the damage.

The prosecution's expert witnesses, Dr. Thomas Owens, a psychiatrist, and Dr. Rushton Backer, a psychologist, reached a different conclusion. They testified that Fisher instead suffered from a "borderline personality disorder," and they found no indication that Fisher had any organic brain damage.

When the court instructed the jury, it refused Fisher's request for an instruction that stated that "[i]f the defendant is acquitted by reason of insanity, he will be presumed to be insane and may be confined in a hospital for the insane as long as public safety and welfare require." The jury returned a verdict of guilty on all counts, and the district court denied Fisher's request for a new trial. *United States v. Fisher*, 808 F.Supp. 390 (M.D.Pa.1992). The court subsequently sentenced Fisher to 57 months' imprisonment, and Fisher took this appeal.

## II.

Fisher first argues that the district court erred in refusing his request for a continuance so that tests for organic brain damage could be performed. "In determining if a continuance should be granted, a court should consider: the efficient administration of criminal justice; the accused's rights, including an adequate opportunity to prepare a defense; and the rights of other defendants awaiting trial who may be prejudiced by a continuance." *United States v. Kikumura*, 947 F.2d 72, 78 (3d Cir.1991), quoting *United States v. Fischbach and Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir. 1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). In addition, the diligence of counsel in requesting the continuance is a relevant factor. *See, e.g., United States v. Cruz–Jiminez*, 977 F.2d 95, 104 n. 13 (3d Cir.1992). On appeal, "[a] trial court's decision to deny a continuance will only be reversed if an abuse of discretion is shown." *Kikumura*, 947 F.2d at 78. We find no abuse of discretion in this case.

Most important, we believe that the timing of the continuance request was unjustifiable. By at least January 1992, when the defense psychiatric report was filed, the defense was aware that its expert had diagnosed organic personality syndrome, and once this diagnosis was made the importance of evidence of organic brain damage should have been apparent. At trial, all of the experts agreed that a diagnosis of organic personality syndrome requires such evidence. Indeed, the defense moved into evidence an excerpt from the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* 114–15 (3d ed—rev. 1987), which lists the following as one of the diagnostic criteria for this disorder:

> There is evidence from the history, physical examination or laboratory tests of a specific organic factor (or factors) judged to be etiologically related to the disturbance.

Thus, as the district court concluded,[1] if the defense thought that an EEG, a CAT scan or MRI were needed, it should have made its request well before it did.

Turning to the other factors that are relevant in determining whether a continuance should be granted, we think it is apparent that granting the continuance would have impaired the efficient administration of justice. By the time this request was made, the district court had already granted numerous continuances and had put off the scheduled trial date for eight months.

Finally, while we cannot rule out the possibility that Fisher may have suffered some prejudice, any such prejudice was not alone sufficient to justify a reversal. Certainly any such prejudice was substantially less than that present in the case on which Fisher relies, *United States v. Pope*, 841 F.2d 954 (9th Cir.1988). There, the denial of a continuance deprived the defendant of "the only evidence potentially supportive of his insanity defense." *Id.* at 957; *see also United States v. Flynt*, 756 F.2d 1352, 1359–61 (9th Cir. 1985). Here, Fisher had the benefit of Dr. Hostetter's expert psychiatric testimony, and Dr. Hostetter testified that he was able to detect organic brain damage without an EEG, a CAT scan, or MRI.[2] In light of all these factors,[3] we find no abuse of discretion in the denial of the continuance request.

## III.

Fisher next argues that the district court erred in not granting a mistrial based on the following colloquy, which occurred during the redirect examination of Dr. Backer (June 9, 1992 Tr. 101–02 (emphasis added)):

Q. With respect to whether the Government's Exhibit 1.1 [one of Fisher's letters] contained a realistic attempt at extortion, did it achieve insofar as Mr. Fisher's expressed goals in *1980–1990 when you first seen him*, did that achieve the goals that he then sought?

A. You mean did the letters achieve the goals? If I understand your question correctly, he—I'm not sure if I'm allowed to go into this part—he wrote letters before, *he has been prosecuted for that*, he had received—

At this point, Fisher's counsel moved for a mistrial based on the solicitation of "prejudicial evidence concerning past prosecutions." The prosecutor responded that he had not sought "to get into past prosecutions" and that his question was "rather inartful." The court then instructed the jury that it should "completely disregard the last answer of the witness," but the court denied the motion for a mistrial, stating that the testimony was not sufficiently prejudicial to warrant that relief.

---

1. *See* 808 F.Supp. at 394; June 9, 1992 Tr. at 30.

2. As the district court observed in denying Fisher's new trial motion (808 F.Supp. at 394 (footnote omitted)):

> Defendant's expert, Dr. Hostetter, testified that such tests were not necessary to his diagnosis, stating that his diagnosis was based on psychological tests performed on the defendant and on his observation of his behavior, speech patterns, conversation, etc.

3. The remaining factor enumerated in *Kikumura*, 947 F.2d at 78—"the rights of other defendants awaiting trial who may be prejudiced by a continuance"—was not addressed by the district court, and therefore we do not rely on this factor in our decision.

On appeal, Fisher contends that a mistrial was required for two reasons. First, he maintains that Dr. Backer's answer severely prejudiced him by informing the jury that he had been previously prosecuted for similar crimes. Second, Fisher argues that the prosecutor's reference to "1980–1990 when you first seen him" suggested that Dr. Backer had been treating him since 1980, that the treatment had been unsuccessful, and that he was therefore "an incorrigible and a lost cause." Appellant's Brief at 11.

We cannot accept Fisher's argument that Dr. Backer's reference to past prosecutions necessitated a mistrial. The prosecutor did not solicit this remark. Rather, it seems clear that Dr. Backer offered it only because he had difficulty understanding the prosecutor's question. Furthermore, the district court provided an immediate curative instruction, and as the Supreme Court has stated:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming possibility' that the jury will be unable to follow the court's instructions ... and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant....

*Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987) (citations omitted). This demanding test for granting a mistrial cannot be met here, especially since the defendant did not contest the fact that he sent the letters in question.

We also reject Fisher's argument that the prosecutor's reference to 1980 required a mistrial. In the first place, this argument was not properly preserved in the district court. When defense counsel moved for a mistrial, he referred only to "prejudicial evidence concerning past prosecutions." He said nothing about the reference to 1980. *See* Fed.R.Evid. 103(a)(1); Fed.R.Cr.P. 52(b).

In any event, even if the argument relating to the reference to 1980 had been preserved, we would not find it meritorious. The record does not support Fisher's contention that the jury was left with the impression that he had been under Dr. Backer's care since 1980. On the contrary, just a short time before the colloquy at issue, Dr. Backer testified that he had first met Fisher in November 1990. June 9, 1992 Tr. at 86. Accordingly, we hold that the district court did not err in failing to grant a mistrial based on the challenged question and answer.

## IV.

Fisher's final and most significant argument is that the district court erred in refusing to instruct the jury regarding the consequences of a verdict of not guilty by reason of insanity ("NGI"). Fisher contends that such an instruction should be required as a result of the passage of the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 4241–4247. Under this Act, certain defendants found NGI must face a civil commitment hearing in federal court within 40 days of the verdict. 18 U.S.C. § 4243(c). At the hearing, the acquittee must prove by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage to the property of another due to a present mental disease or defect. 18 U.S.C. § 4243(d). If the acquittee fails to make that showing, he must be committed to the custody of the Attorney General so that appropriate arrangements for custody, care, and treatment can be made. 18 U.S.C. § 4243(e). Thereafter, if the director of the facility in which the acquittee is hospitalized finds that the acquittee has recovered to such an extent that his release, with or without conditions, would no longer create a substantial risk of bodily injury to another person or serious damage to the property of another, the director must file a certificate to that effect with the court. 18 U.S.C. § 4243(f). The court must then order the person discharged or, on motion of the government, hold a hearing and determine whether the standard for release can be met. *Id.*

Before the Insanity Defense Reform Act was enacted in 1984, federal law provided no mechanism for securing the civil commitment of a federal defendant found NGI. Instead, such a defendant could be civilly committed only pursuant to state procedures. *See*

*United States v. McCracken,* 488 F.2d 406, 416–17 (5th Cir.1974). By contrast, the District of Columbia did have a commitment procedure for NGI defendants, and the District of Columbia Circuit required a trial judge, upon a defendant's request, to instruct the jury about the consequences of an NGI verdict. *See, e.g., Lyles v. United States,* 254 F.2d 725 (D.C.Cir.1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958).

In *United States v. Alvarez,* 519 F.2d 1036, 1048 (3d Cir.1975), we were asked to impose a similar requirement, but we refused, "primarily because [the requested instruction] would, with respect to a federal defendant outside the District of Columbia, convey to the jury a misleading impression." *Id.; see also United States v. Austin,* 533 F.2d 879, 885–86 (3d Cir.1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 746, 50 L.Ed.2d 756 (1977).[4] Now that Congress has provided a federal mechanism for committing such defendants, Fisher urges us to hold—contrary to recent decisions of the Second, Fifth, Ninth, and Eleventh Circuits[5]—that a trial judge must instruct the jury concerning the consequences of an NGI verdict when so requested by the defense.

■ In assessing Fisher's argument, we begin by considering whether the Insanity Defense Reform Act requires that such an instruction be given, and we thus turn to the language of that Act. If the language of a statute is unambiguous, our inquiry must stop except in those rare cases in which "the literal application of the statute will produce a result demonstrably at odds with the intention of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); *see also United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103

L.Ed.2d 290 (1989). The text of the Insanity Defense Reform Act makes no mention whatsoever of jury instructions. Consequently, it seems clear without further inquiry that the Act itself does not require the type of instruction that Fisher sought.

■ We are aware that a passage in the very lengthy Senate report accompanying the Act endorses Fisher's argument. This passage states:

> The Committee endorses the procedure used in the District of Columbia whereby a jury, in a case in which the insanity defense has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity. If a defendant requests that the instruction not be given, it is within the discretion of the court whether to give it or not.

S.Rep. No. 225, 98th Cong., 2d Sess. 240 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3422. Needless to say, however, this passage does not itself have the force of law; nor does it purport to illuminate any ambiguous statutory language. Accordingly, this passage does not require us to adopt the rule embraced by the District of Columbia Circuit. As that court itself has aptly noted in another context, "a committee report cannot serve as an independent statutory source having the force of law.... A cardinal principle of the judicial function is that courts have no authority to enforce principles gleaned solely from legislative history that has no statutory reference point." *International Brotherhood of Electrical Workers v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis in original omitted). *See also United States v. Shannon,* 981 F.2d 759, 763–64 (5th Cir. 1993); *United States v. Barnett,* 968 F.2d 1189, 1192 n. 3 (11th Cir.1992); *United States v. Blume,* 967 F.2d 45, 53 (2d Cir.1992)

---

4. In *Government of the Virgin Islands v. Fredericks,* 578 F.2d 927, 933–36 (3d Cir.1978), we confronted an analogous argument in a case involving the law of the Virgin Islands, which did have a statutory procedure for committing defendants found not guilty by reason of insanity. We did not, however, decide whether the trial judge had erred in refusing to give the requested instruction. Instead, we held that any error was harmless because the jury had been given the same information at voir dire.

5. *United States v. Rena,* 981 F.2d 765 (5th Cir. 1993); *United States v. Thigpen,* 4 F.3d 1573 (11th Cir.1993) (in banc); *United States v. Blume,* 967 F.2d 45 (2d Cir.1992); *United States v. Frank,* 956 F.2d 872 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992). *Cf. United States v. Neavill,* 868 F.2d 1000 (8th Cir.) (holding instruction required), *vacated and rehearing in banc granted,* 877 F.2d 1394 (8th Cir.), *appeal voluntarily dismissed,* 886 F.2d 220 (8th Cir.1992).

(Winter, J., concurring); *United States v. Frank*, 956 F.2d 872, 881 (9th Cir.1991). As a result, we do not believe that the Insanity Defense Reform Act of 1984 mandates the blanket rule that Fisher urges us to adopt.

Nor do we believe that this blanket rule is required by due process or that it would be appropriate for us to impose this rule upon the district courts pursuant to our supervisory power. Instead, we hold that the decision whether to give such an instruction in a particular case should be left to the sound discretion of the trial judge.

In the federal courts, the role of the jury in a non-capital case is to determine whether the defendant is guilty or not guilty based on the evidence and the applicable rules of law. The jury is supposed to perform this role without being influenced in any way by what the consequences of its verdict might be. *See Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975); *Government of the Virgin Islands v. Fredericks*, 578 F.2d 927, 935 (3d Cir.1978). Thus, federal criminal juries are almost never instructed concerning the consequences of verdicts. On the contrary, they are often specifically instructed not to consider those consequences. *See, e.g., United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir.1990); *United States v. Smith*, 450 F.2d 312 (3d Cir.1971), *cert. denied*, 405 U.S. 932, 92 S.Ct. 989, 30 L.Ed.2d 807 (1972). Indeed, they are often sternly warned that they would violate their oaths if they did so. *See, e.g.*, Sixth Circuit Pattern Jury Instruction No. 8.05; 1 L. Sand, J. Siffert, W. Loughlin, and S. Reiss, *Modern Federal Jury Instructions—Criminal* ¶ 9.01 (1993).

The rule that a jury should not consider the consequences of its verdict is just as applicable in cases involving the insanity defense as it is in any other case. In insanity defense cases, the role of the jury is to determine, based on the evidence and the applicable legal rules, whether the defendant is guilty, not guilty, or NGI. 18 U.S.C. § 4242(b). In making that determination, the jury should not be influenced in any way by the consequences that it believes may result from any of these verdicts.

Those who advocate the type of instruction at issue here do not contend that the jury in an insanity defense case should consider the consequences of its verdict. Rather, their chief argument is that such an instruction is needed as an antidote, i.e., to counteract the false idea that an NGI verdict will necessarily mean that the defendant will be released into the community.[6] Otherwise, they suggest, the jury may convict a defendant whom it believes to be insane but whom it fears would commit additional dangerous crimes if set free as the result of an NGI verdict.

We agree that this type of instruction may be a useful antidote when the trial judge has some basis for concluding that the jury might otherwise be improperly influenced by a false belief concerning the consequences of an NGI verdict. At the same time, however, we believe that this antidote should be administered with care and on a case-by-case basis.

First and most important, this antidote may itself produce deleterious consequences. After all, it brings to the jury's attention and highlights precisely the sort of information—information about the consequences of a verdict—that the jury is not supposed to consider. Therefore, this instruction may cause the jury to focus on and be influenced by the consequences of its verdict, and thus the instruction may paradoxically have the very effect that it is intended to counteract.[7]

---

6. *See, e.g., United States v. Blume*, 967 F.2d at 52 (Newman, J., concurring).

7. Suppose, for example, that a jury is split 10–2 in favor of insanity over guilt. As a result of an instruction concerning the consequences of an NGI verdict, the two jurors who believe that the defendant is sane and guilty might be persuaded to accept an NGI verdict, not because they are won over by the other jurors' arguments based on the evidence and the applicable law, but solely because they think that the defendant would be civilly committed for an indefinite time and that this commitment would approximate the incarceration that they believe would be imposed if the defendant were convicted. *Cf.* 18 U.S.C. § 4244(d) (in lieu of punishment, convicted defendant may be committed for care or treatment of mental disease or defect). Or, suppose that the jury is split 10–2 in favor of guilt over insanity. The two jurors who believe that the defendant is insane might accede to a verdict of guilty solely because they, too, believe that the incarceration that would follow a guilty verdict would

Moreover, as observed in *Fredericks*, 578 F.2d at 936 n. 15, "it is not at all clear" that jurors are generally ignorant of the fact that NGI acquittees may be civilly committed. On the contrary, highly publicized cases, such as that involving John Hinckley, have dramatized the possibility of civil commitment following an NGI verdict.

Finally, we have some reservations about the effectiveness for antidotal purposes of an accurate instruction concerning the consequences of an NGI verdict. As previously noted, the main argument in favor of such an instruction hypothesizes jurors who are willing to convict the defendant, even though they believe him to be NGI, solely to ensure that he is not released. But if the members of a jury are so fearful of a particular defendant's release that they would violate their oaths by convicting him solely in order to ensure that he is not set free, it is questionable whether they would be reassured by anything short of an instruction strongly suggesting that the defendant, if found NGI, would very likely be civilly committed for a lengthy period. An accurate instruction about the consequences of an NGI verdict, however, cannot provide such assurance. A defendant found NGI is entitled to a release hearing within 40 days after the verdict and may be released as soon as the hearing is completed. 18 U.S.C. § 4243(a)–(e). "The only mandatory period of confinement, therefore, is the period between the verdict and the hearing, which may be held at any time within forty days." *United States v. Blume*, 967 F.2d at 54 (Winter, J., concurring). While it is true that the defendant, in order to be released, must prove by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage to the property of another, a jury in an insanity defense case will often have no way of predicting whether or when the defendant will be able to meet this standard. Although the jury in such a case will presumably hear testimony concerning the defendant's sanity at the time of the offense, it will not necessarily hear any testimony bearing on the separate question whether the defendant would pose a danger if released after the verdict.

In sum, while we believe that the type of instruction at issue may be helpful in some cases, we are sufficiently apprehensive about its possible side effects and sufficiently uncertain about its usefulness that we are not willing to adopt a blanket rule requiring that such an instruction always be given when the defense so requests. Instead, we think that it is preferable to leave the decision whether to give such an instruction within the sound discretion of the trial judge. The judge should seriously consider an appropriate instruction[8] in those cases in which the judge has a particularized reason for believing that the instruction will prevent the jury from being influenced by improper considerations—for example, if a witness or attorney intimates during trial that an NGI verdict would endanger the community or if the nature of the evidence suggests to the judge that the jury is likely to entertain that thought on its own. On the other hand, where the judge believes that the instruction is likely on balance to encourage the jury to

be similar to the civil commitment that would result from an NGI verdict. Finally, to take the example we noted in *Fredericks*, 578 F.2d at 936, "[a] juror that is convinced that a defendant is dangerous but who believes that he did not, in fact, commit the acts charged, might be willing to compromise on a verdict of not guilty by reason of insanity rather than insist on an acquittal." In these circumstances and perhaps others, the effect of instructing the jury concerning the consequences of an NGI verdict would disserve the interests of justice.

8. We have not attempted in this opinion to specify precisely what should be included in such an instruction. We do note, however, that the instruction requested by Fisher should not be used as a model. By stating that an NGI acquittee is "presumed insane" and "may be confined," this instruction incorrectly suggests that the tests for insanity and civil commitment are the same. *Compare* 18 U.S.C. § 17(a) *with* 18 U.S.C. § 4243(d). Furthermore, we do not think that Fisher's instruction adequately paraphrases the standard for commitment under 18 U.S.C. § 4243(c). Whereas this provision requires commitment unless the acquittee proves that he "would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect," Fisher's instruction broadly states that an NGI acquittee could be confined "as long as public safety and welfare require."

focus on improper considerations, the judge should be wary about giving the instruction.

In this case, the district court did not abuse its discretion in refusing to give the requested instruction. As the district court noted in denying Fisher's new trial motion, it is unlikely that the jury assumed that Fisher would be immediately released if he was acquitted of the offenses charged. In the district court's words, "the jury necessarily knew that the defendant was incarcerated at the time of trial," and it would therefore be "illogical to assume that they would conclude that he would be released into society should they return a verdict of not guilty by reason of insanity." Furthermore, it does not appear that any witness or attorney suggested that Fisher would pose a danger to the community if found NGI. Under these circumstances, we hold that the district court did not abuse its discretion in refusing to give the instruction requested by the defense.

## V.

For the reasons explained above, we affirm Fisher's conviction.