**UNITED STATES of America, Appellee,**

v.

**James NEAVILL, Appellant.**

No. 87–2692.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 22, 1988.

Decided March 1, 1989.

David H. Rubin, St. Louis, Mo., for appellant.

Steven E. Holtshouser, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before LAY, Chief Judge, ARNOLD and FAGG, Circuit Judges.

ARNOLD, Circuit Judge.

James Neavill was convicted of threatening to take the life of the President, a violation of 18 U.S.C. § 871(a).[1] He now appeals, arguing that the jury should have been instructed as to the consequences of a verdict of not guilty by reason of insanity, that the jury was incorrectly instructed about the *mens rea* of the offense, that the evidence was legally insufficient, and that certain evidence was erroneously admitted. Because the jury should have been told about the implications of reaching a verdict of not guilty by reason of insanity, we reverse and remand for a new trial.

### I.

On April 28, 1987, eight days after discharging himself from the Missouri State Hospital, James Neavill walked into the Festus, Missouri, police station and threatened to kill the President. He claimed that "James Beckman [was] God" and had hired him to assassinate the President for $35,-000 with an Uzi submachine gun sometime in May. Neavill initially told the officer on duty, Sergeant Self, that he "had a job to do that he didn't think he could finish." The officer, who testified that Neavill appeared intoxicated and had a well-known history of mental illness, put him in protective custody. Sergeant Self then called the Secret Service to report the threat on the President's life. The Secret Service sent over an agent to question Neavill at the Festus jail. Neavill repeated his threats to the agent, this time not wavering in his announced resolve to carry them out. When asked by the agent what he would do if he were released from custody, he replied, "put a bullet in the President's head."

Neavill was indicted by a grand jury on the charge of violating 18 U.S.C. § 871(a). He was found competent to stand trial after an examination by Dr. Clayton Pettipiece, Chief of Psychiatry at the Medical Center for Federal Prisoners in Springfield. At trial Neavill's main defense was insanity. The jury was presented with evidence that Neavill, aged thirty, had been hospitalized thirty-eight times over the preceding ten years, for periods ranging from five days to four months. A Secret Service agent testified that once before, in 1982, Neavill had been investigated for making threats on the President's life, but that no action had been taken in connection with that incident. The jury learned that the Social Security Administration had determined that Neavill was unable to work due to his mental impairments. The defense brought in psychiatrists who testified that

---

**1.** The statute reads as follows:

    (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Neavill was a paranoid schizophrenic. The psychiatrists told the jury that Neavill had been treated with antipsychotic medication during his numerous commitments, including his hospitalization while awaiting trial. Evidence was presented that the James Beckman who Neavill claimed had hired him to kill the President was in fact a fellow mental patient from a prior hospitalization.

The state's psychiatrists contested the diagnosis of schizophrenia, contending Neavill's primary problems were alcohol and drug abuse and malingering. The government brought out that prior to one of his commitments, Neavill was in possession of a .38 caliber pistol. All experts were vigorously cross-examined by opposing counsel.

The jury returned a guilty verdict, and Neavill was sentenced to five years' imprisonment. However, in lieu of incarceration in a federal prison, Neavill was committed to a psychiatric facility as permitted under 18 U.S.C. § 4244. He is currently hospitalized at the Medical Center in Springfield.

## II.

■ Neavill argues that the trial court erred in rejecting his proposed instruction on the consequences of a verdict of not guilty by reason of insanity. Conceding that generally it is not appropriate to instruct the jury on the sentence the defendant might receive, see, *e.g., United States v. McCracken*, 488 F.2d 406, 423 (5th Cir. 1974), since that would "tend to draw the attention of the jury away from their chief function as ... judges of the facts," *id.* (quoting *Pope v. United States*, 298 F.2d 507, 508 (5th Cir.1962), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965)), Neavill contends that when the insanity defense is involved the situation is different. He relies on *Lyles v. United States*, 254 F.2d 725 (D.C.Cir.1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), a prosecution under the District of Columbia Code, where the Court said:

> The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty

by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning.

*Id.* at 728. Neavill contends that because the jurors may have had misconceptions about the meaning of a not guilty by reason of insanity verdict—perhaps believing the defendant would automatically go free—they should have been instructed as to its actual implications. The jury should have been told, Neavill argues, that a verdict of not guilty by reason of insanity would result in his being committed for treatment. Jurors who did not know this, he says, might have returned a verdict of guilty, despite entertaining a reasonable doubt as to Neavill's sanity, simply to keep him off the street.

Before the passage of the Insanity Defense Reform Act, our own Court rejected the *Lyles* rationale in *Pope v. United States*, 372 F.2d 710 (8th Cir.1967), *vacated on other grounds* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), holding "we ... see no reason why we should depart from the long-established principle that, in the absence of some specific statutory provision, a defendant's disposition is not a matter for the jury's concern." *Id.* at 731 (Blackmun, J.); see also *Apgar v. United States*, 440 F.2d 733, 737 (8th Cir.1971). We distinguished *Lyles* by explaining that the District of Columbia Code provided for a special plea of not guilty by reason of insanity and for commitment in the event of such a verdict. Federal law other than the District of Columbia Code did not then contain these provisions. A federal jury had to choose between verdicts of guilty and not guilty, and disposition of the defendant after a successful insanity defense was unclear. Unless federal officials could persuade local authorities to institute civil

commitment proceedings, the defendant would go free.

Our rejection, in *Pope*, of Neavill's argument would end the matter if it were not for a subsequent Act of Congress which sheds new light on the question. After John Hinckley's attempt on President Reagan's life, Congress enacted the Insanity Defense Reform Act of 1984, which made sweeping changes in the insanity defense in federal courts. For example, insanity is now an affirmative defense that the defendant must prove by offering clear and convincing evidence. 18 U.S.C. § 17. (Under prior law, once the defendant raised the issue of insanity, the government had the burden of disproving the defense beyond a reasonable doubt.) The Act also makes possible a special verdict of not guilty by reason of insanity, 18 U.S.C. § 4242(b), and sets out a comprehensive commitment procedure. 18 U.S.C. § 4243.[2] Perhaps most

2. 18 U.S.C. § 4243, which is at the heart of this case, reads as follows:

(a) Determination of present mental condition of acquitted person.—If a person is found not guilty only by reason of insanity at the time of the offense charged, he shall be committed to a suitable facility until such time as he is eligible for release pursuant to subsection (e).

(b) Psychiatric or psychological examination and report.—Prior to the date of the hearing, pursuant to subsection (c), the court shall order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247(b) and (c).

(c) Hearing.—A hearing shall be conducted pursuant to 4247(d) and shall take place not later than forty days following the special verdict.

(d) Burden of proof.—In a hearing pursuant to subsection (c) of this section, a person found not guilty only by reason of insanity of an offense involving bodily injury to, or serious damage to the property of, another person, or involving a substantial risk of such injury or damage, has the burden of proving by clear and convincing evidence that his release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect. With respect to any other offense, the person has the burden of such proof by a preponderance of the evidence.

(e) Determination and disposition.—If, after the hearing, the court fails to find by the standard specified in subsection (d) of this section that the person's release would not create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility until—

(1) such a State will assume such responsibility; or

(2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment, would not create a substantial risk of bodily injury to another person or serious damage to property of another;

whichever is earlier. The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment.

(f) Discharge.—When the director of the facility in which an acquitted person is hospitalized pursuant to subsection (e) determines that the person has recovered from his mental disease or defect to such an extent that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment, would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, he shall promptly file a certificate to that effect with the clerk of the court that ordered the commitment. The clerk shall send a copy of the certificate to the person's counsel and to the attorney for the Government. The court shall order the discharge of the acquitted person or, on the motion of the attorney for the Government or on its own motion, shall hold a hearing, conducted pursuant to the provisions of section 4247(d), to determine whether he should be released. If, after the hearing, the court finds by the standard specified in subsection (d) that the person has recovered from his mental disease or defect to such an extent that—

(1) his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall order that he be immediately discharged; or

(2) his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would no longer create a substantial risk of bodily inju-

important to resolution of this case, the legislative history of the Act endorses the "procedure used in the District of Columbia whereby the jury, in a case in which the insanity [defense] has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity." S.Rep. No. 98–225, 98th Cong., 1st Sess. 240 (1983), *reprinted in* 1984 U.S.Code Cong. & Adm. News 3182, 3422. In the District of Columbia, such an instruction must be given if the defendant requests it.[3] Neavill argues that the Insanity Defense Reform Act either overrules our decision in *Pope,* or at the very least gives us a chance to re-examine the decision, since its predicates have changed.

The government argues that the Act does not invalidate *Pope,* stressing that the Act does not require by its own terms that a special instruction be given. For support, the government turns to the language of *Pope:*

> [W]e, however, find no error and see no reason why we should depart from the long-established principle that, in the absence of *some specific statutory provision,* a defendant's disposition is not a matter for the jury's concern.

*Pope, supra,* at 731 (emphasis added). The government claims that by "specific statutory provision" the Court did not mean statutory commitment procedures, but a provision requiring that a specific instruction be given.

We are not persuaded by the government's position. A reading of the entire *Pope* opinion reveals that the Court was basing its decision at least in part on the absence of a federal commitment statute. Immediately after the quoted passage, the Court distinguishes *Lyles* by observing not that a specific statute required that the jury charge be given, but that the District of Columbia had unique commitment procedures which came into effect after a not guilty by reason of insanity verdict.[4] The balance of the Court's discussion is on this point. Further, the legislative history of the new Act shows that Congress agreed with the D.C. Circuit that jurors are not sure what happens to defendants who successfully plead not guilty by reason of insanity, and that in this special situation they ought to be informed of the defendant's disposition after the verdict. Thus, we hold that because some of the assumptions underlying *Pope* are no longer valid in light of the Insanity Defense Reform Act, and because the Senate Committee on the Judiciary has endorsed the D.C. Circuit rule, the jury should have been informed of

---

ry to another person or serious damage to property of another, the court shall—

(A) order that he be conditionally discharged under a prescribed regimen of medical, psychiatric, or psychological care or treatment that has been prepared for him, that has been certified to the court as appropriate by the director of the facility in which he is committed, and that has been found by the court to be appropriate; and

(B) order, as an explicit condition of release, that he comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment.

The court at any time may, after a hearing employing the same criteria, modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment.

(g) Revocation of conditional discharge.— The director of a medical facility responsible for administering a regimen imposed on an acquitted person conditionally discharged under subsection (f) shall notify the Attorney General and the court having jurisdiction over the person of any failure of the person to comply with the regimen. Upon such notice,

or upon other probable cause to believe that the person has failed to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, the person may be arrested, and, upon arrest, shall be taken without unnecessary delay before the court having jurisdiction over him. The court shall, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another.

3. The word "may" in the legislative history refers to the discretionary authority of the trial court to give or withhold the instruction if the defendant requests that it not be given. *Id.; Lyles,* 254 F.2d at 728–29.

4. The D.C.Code did not by its own terms require the giving of a specific jury instruction. See *Lyles,* 254 F.2d at 728–29.

the consequences of a verdict of not guilty by reason of insanity.

█ The government also argues that the alleged error with respect to the omitted instruction on the consequences of a verdict of not guilty by reason of insanity was not properly preserved. The record shows that counsel for the defendant initially requested an instruction stating simply that his client would be committed for psychiatric treatment (instead of going free) in the event of a verdict of not guilty by reason of insanity. This of course was not a correct statement of the law. The commitment procedures contained in 18 U.S.C. § 4243, which we have set out above, are considerably more complicated. Essentially, commitment occurs after a verdict of not guilty by reason of insanity only if the trial court then makes a finding that release of the defendant would be dangerous. If this were all that the record showed, we would agree with the government that the error was not properly preserved for appellate review. However, once the trial court told him that the suggested instruction was inadequate, counsel for Neavill offered to correct it by adding the details of the commitment procedure set out in § 4243. The District Court refused to allow any instruction on the subject, even if modified to reflect the statutory commitment procedure accurately. Under these circumstances, counsel's offer to change the instruction to conform it to § 4243 properly preserved his objection. It was clear that the District Court believed that no instruction on the subject, even one accurately reflecting the statutory commitment procedure, should be given.

█ We have considered, in addition, whether the error can be ignored as harmless. If the evidence against the asserted defense of insanity were overwhelming, we could well decide to overlook the court's failure to instruct the jury in accordance with the Report of the Senate Committee on the Judiciary. But the evidence was not overwhelming. Experts testified in detail on both sides. While the jury was not obliged to accept the testimony of defendant's experts, as we shall explain at greater length later in this opinion, a decision to do so would have been well within the bounds of rationality. In these circumstances, the jurors' probable ignorance of the effect on Neavill of a verdict of not guilty by reason of insanity could well have affected the verdict. We are unable to say with the requisite degree of assurance that the error was not prejudicial. Accordingly, a new trial must be held.

### III.

█ Because the issues may recur at the new trial, we address in addition the other points urged by Neavill in support of reversal. They are all without merit. Neavill first contends that the District Court plainly erred in instructing the jury as to the definition of "knowingly and willfully," an element of the charged offense. The District Court told the jury that a threat was willfully made if the words were uttered as "a declaration of an apparent determination to carry out the threat." Neavill argues that the jury should have been given a subjective, rather than objective, standard for determining willfulness. In his view, his actual, internal intention is what mattered, not what his intention appeared to be to another person.

Neavill's trial counsel did not object to the instruction given. Thus, we must decide only if the District Court committed plain error in giving the instruction. Fed. R.Crim.P. 52(b). This was not the case. Although our Court has not addressed the issue, see *United States v. Frederickson*, 601 F.2d 1358, 1362–64 (8th Cir.), *cert. denied*, 444 U.S. 934, 100 S.Ct. 281, 62 L.Ed. 2d 193 (1979),[5] the objective standard has been adopted by a majority of circuits. See, *e.g., United States v. Howell*, 719 F.2d 1258, 1260 (5th Cir.1983), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878

---

**5.** In *Frederickson* the Court measured the sufficiency of the evidence against a subjective standard. However, it did so only because that was the instruction given by the District Court, and

no objection was made to the instruction. *Frederickson, supra*, at 1363. The Court expressed no view on the correctness of the instruction.

(1984); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Dysart*, 705 F.2d 1247, 1256 (10th Cir.), *cert. denied*, 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 307 (1983). Only the Fourth Circuit has adopted the subjective standard. *United States v. Patillo*, 431 F.2d 293 (4th Cir. 1970). While the Supreme Court once expressed "grave doubts" about the apparent-determination standard, *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969), and Justice Marshall has pushed for the adoption of a subjective standard, *Rogers v. United States*, 422 U.S. 35, 48, 95 S.Ct. 2091, 2099, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring), the trend towards an objective standard has persisted. For the District Court to give an instruction in accord with the law in a majority of the circuits cannot be plain error.

### IV.

██ Neavill argues that the guilty verdict returned by the jury is not supported by legally sufficient evidence. First, he contends that the government failed to prove the elements of the crime beyond a reasonable doubt, claiming that the government did not prove he made or intended a true or serious threat against the President's life. Second, he argues that he proved his affirmative defense of insanity by clear and convincing evidence.

When evaluating a claim that a jury verdict is supported by insufficient evidence, we view the evidence in the light most favorable to the verdict rendered, and accept all reasonable inferences from the evidence which tend to support the jury verdict. *United States v. Taylor*, 599 F.2d 832, 838 (8th Cir.1979). Neavill's attacks on the sufficiency of the evidence come down to whether the jury should have believed the government's witnesses or his own. He contends the jury should have rejected the law enforcement officers' testimony that he was serious about his threat, and should have given greater weight to the testimony of the defense psychiatrists.

Such questions of weight and credibility are for the jury.

### V.

██ Neavill's final argument for reversal is that the District Court erred in allowing the government to question one of its psychiatric experts, Dr. Pettipiece, about the contents of a letter purportedly written by the defendant. Dr. Pettipiece was the government's second rebuttal witness, the second psychiatrist to dispute the defense claim that Neavill was insane when he committed the offense. On direct examination, the government asked Dr. Pettipiece about the basis for his diagnosis of malingering. In response, Dr. Pettipiece referred to his own examination of Neavill. The government then inquired about a letter Neavill had supposedly written to the staff at the Farmington State Hospital, the location of one of his previous hospitalizations. The defense objected immediately, arguing that it had not been provided with a copy of this letter during discovery. After reviewing the letter, the defense continued to object to its admission, arguing that it had not been written by the defendant. The District Court sustained the objection on the ground that the letter had not been properly authenticated.

On cross-examination, defense counsel questioned Dr. Pettipiece about the basis of his diagnosis. The defense went through each prior psychiatric hospitalization in which schizophrenia had been diagnosed and asked the doctor about it. As the defense lawyer began to do this, the trial judge cautioned him that he might be opening the door to admission of the debated letter. On redirect the government again asked Dr. Pettipiece about the basis for his diagnosis, and the doctor replied that, among other things, he relied on the letter. The government then asked what aspects of the letter he relied on, and Dr. Pettipiece answered that he relied on defendant's statements that his "mind was cleared up now" and that he "really wasn't paralyzed" as he claimed to have been. Tr. 185. At this point, defense counsel again objected, and the Court ordered the jury to disregard

Dr. Pettipiece's last answer. On appeal, Neavill contends that allowing Dr. Pettipiece's remarks was prejudicial error of the sort that a subsequent instruction to disregard could not correct.

If there was any error, it was harmless. Very little of the letter's contents was actually mentioned. What was mentioned was immediately struck by the Court. We must assume the jurors upheld their oaths and obeyed the judge's directions. In any case, Dr. Pettipiece testified that the letter played only a small part in his diagnosis. The doctor had already been thoroughly cross-examined by the defense, and on recross the defense was given a chance to bring out the fact that the letter may not have been written by the defendant. On balance, it is clear that the defendant was not prejudiced.

## VI.

The judgment of the District Court is reversed, and the case remanded for a new trial in accordance with this opinion.

FAGG, Circuit Judge, dissenting.

James Neavill threatened to kill the President of the United States in violation of 18 U.S.C. § 871(a). Nevertheless, this court reverses the judgment against Neavill because the district court refused to give an instruction that was not required under a long-standing precedent in this circuit. I dissent.

First, the district court did not commit reversible error by refusing to instruct the jury regarding Neavill's disposition if he were found not guilty only by reason of insanity. This information was extraneous to the jury's realm of concern. Ordinarily, in criminal matters, the jury determines only the guilt or innocence of the accused, and the district court determines a defendant's disposition after the verdict. Thus, Neavill's proposed instruction would have taken the jury into an area beyond its defined role. See Government of V.I. v. Fredericks, 578 F.2d 927, 935–36 (3d Cir. 1978).

By requiring the proposed instruction, this court accepts Neavill's rationale that in reaching its verdict the jury might consider the potential threat Neavill's release could pose to the community. See id. at 935. This rationale ignores the traditional presumption that the jury follows its instructions closely, including those defining the jury's role. See id. at 936; see also Francis v. Franklin, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985); United States v. Cosby, 529 F.2d 143, 149 (8th Cir.), cert. denied, 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). Further, although unnoticed by the court, this rationale "could be prejudicial to * * * criminal defendant[s]. A juror who is convinced that a defendant is dangerous, but who believes [the defendant] did not * * * commit the [crime] charged, might be willing to compromise on a verdict of not guilty by reason of insanity rather than insist on an acquittal." Government of V.I., 578 F.2d at 936.

Apart from well-established and sensible reasons for leaving this particular instructional decision to the sound discretion of the district court, no basis for reversal can be found in the record. Neavill has failed to show that in deliberating, the jury in this case considered extraneous information or held misconceptions that affected its verdict. Nor is the record before this court favored with studies demonstrating that in cases involving the insanity defense jurors are confused, ignore their instructions, or consider extraneous factors such as the defendant's disposition after the verdict. Surely, this court does not hold the jury system in such low regard that it is willing to reject the presumption that the jury follows its instructions based on mere speculation. See United States v. Morris, 623 F.2d 145, 148 (10th Cir.), cert. denied, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980); see also United States v. Hoelker, 765 F.2d 1422, 1426 (9th Cir.1985), cert. denied, 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986).

Nor do I believe we must require the instruction because Congress enacted a new statutory confinement provision, 18 U.S.C. § 4243 (Supp. IV 1986). Indeed, the confinement provision is silent on the in-

struction. The legislative history does favor the practice that a jury "may be instructed on the effect of a verdict of not guilty by reason of insanity." S.Rep. No. 225, 98th Cong., 1st Sess. 240 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3422. That preference, however, is not a mandate. Thus, the statute and the legislative history provide no basis on which to reverse the district court.

Second, I question the panel's authority to reach its result. Over twenty years ago, this court established that a district court does not commit reversible error by giving or refusing to give the type of instruction Neavill requested here. *See Pope v. United States*, 372 F.2d 710, 731–32 (8th Cir. 1967), *vacated on other grounds and remanded*, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). In then Judge Blackmun's words, "justice does not require the specifics, questionable at best, [that] the defense demanded." *Id.* at 732. Although the *Pope* court acknowledged that no statutory confinement procedure then existed, I believe the court declared our rule based firmly on the traditional role of the jury in our system of justice. *See id.* at 731–32. The Fifth Circuit has also read *Pope* as based on the jury's role in our system. *See United States v. McCracken*, 488 F.2d 406, 423 (5th Cir.1974) ("[M]any courts have explicitly based their approval of not instructing on the consequences of an [insanity] verdict on the *applicability* of [the] principle [that the instruction relays information outside the jury's concern] * * *." (emphasis in original) (citing *Pope*, 372 F.2d at 731)).

The rule declared in *Pope* is stare decisis in this circuit. Consequently, this panel oversteps its bounds and invades the realm of the en banc court by overruling *Pope*. *See Brown v. First Nat'l Bank*, 844 F.2d 580, 582 (8th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 20, 101 L.Ed.2d 971 (1988).

Because I conclude the district court committed no reversible error, I would affirm.