**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Allan BLUME, Toby Pett, Roger Ward, Defendants,**

**David Bianchini, Defendant–Appellant.**

No. 955, Docket 91–1570.

United States Court of Appeals, Second Circuit.

Argued Feb. 28, 1992.

Decided June 10, 1992.

Thomas D. Anderson, Asst. U.S. Atty. (Charles A. Caruso, U.S. Atty., D. Vt., David V. Kirby, Chief, Crim. Div., of counsel), Burlington, Vt., for plaintiff-appellee.

Kimberly Homan (Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, Norman S. Zalkind, David Duncan, of counsel), Boston, Mass., for defendant-appellant.

Before: LUMBARD, NEWMAN, and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

David Bianchini appeals from his conviction after a jury trial in the District Court for the District of Vermont, Franklin S. Billings, *Chief Judge*, and from the resulting sentence of 250 months imprisonment

for conspiracy to manufacture marijuana, for possession of marijuana with intent to distribute, and for interstate travel in furtherance of illegal activity. 759 F.Supp. 1081 (D.Vt.1991). He contends that the district court's rulings regarding third-party contact with a juror denied him the right to trial by an impartial jury, that failure to instruct the jury on the consequences of a verdict of not guilty by reason of insanity constituted error, and that the district court incorrectly calculated the weight of marijuana involved for purposes of applying the sentencing guidelines. We affirm the conviction and remand for resentencing.

It is uncontested that David Bianchini and his co-conspirators operated two highly sophisticated marijuana farms in Vermont, one in Glover, the other in West Charleston. Police searches uncovered elaborate indoor farms with specially tailored climate control and lighting equipment and approximately 3700 mature marijuana plants. Bianchini's arrest followed.

On August 30, 1990, a grand jury returned a five-count indictment against Bianchini and his co-conspirators,[1] charging them with manufacturing, possessing and distributing marijuana, with conspiracy to manufacture, possess and distribute marijuana, and with interstate travel in furtherance of illegal activity. At trial, Bianchini did not contest the charges, but instead offered an insanity defense based on his experiences in the Vietnam War.

During the trial, one of the jurors, Arthur Tenner, informed Judge Billings that he had received a telephone call from an unidentified man, offering him $5,000 to secure a mistrial. The judge allowed Tenner to remain on the jury while the F.B.I. investigated the matter.[2] He instructed Tenner not to discuss the call with other members of the jury or anyone else outside the investigation.

After two days of testimony, the trial stood adjourned for Thanksgiving recess.

Over the weekend, Tenner received a note threatening his life. On the following Monday, Tenner reported to Judge Billings that he could not remain impartial, and the judge dismissed him from the jury. At that time, the judge informed trial counsel about the events involving Tenner and indicated that he would conduct a voir dire of the jury panel. Neither party objected.

When questioned, the remaining jurors indicated that they had not been approached by any third party, but two jurors said they had spoken to Tenner about the case. When Judge Billings examined these jurors in chambers, they told him that Tenner had made some disparaging remarks about Bianchini's insanity defense. Neither juror, however, appeared to know anything about the attempted bribe, and both assured the judge that they could remain impartial. This voir dire was conducted in the presence of counsel, and neither party objected or asked for a mistrial.

After the jury returned a verdict of guilty on all counts, Bianchini filed a motion for a new trial on the ground that the events involving Tenner denied him the right to trial by an impartial jury. In an opinion and order dated March 18, 1991, Judge Billings denied the motion. On September 19, 1991, Bianchini was sentenced to a term of 250 months imprisonment on the drug charges and to a term of 60 months on the Travel Act count running concurrently, to be followed by five years of supervised release. In addition, he was fined a total of $25,000 and was assessed $50 on each of the five counts. This appeal followed.

■ Bianchini maintains that the decision to allow Tenner to continue to sit on the jury for two days while the F.B.I. investigated the bribery attempt deprived him of a fair trial, and that the failure to grant a new trial after the jury returned the guilty verdicts constituted reversible error. We disagree. "The Constitution 'does not require a new trial every time a

---

**1.** One co-conspirator, Allan Blume, pled guilty and cooperated with the government. Another co-conspirator, Brian Brophil, is a fugitive.

**2.** The investigation did not uncover the identity of the caller. There is no evidence to link Bianchini to the bribery attempt.

juror has been placed in a potentially compromising situation.'" *United States v. Aiello,* 771 F.2d 621, 629 (2d Cir.1985) (quoting *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam)). As the Supreme Court has stated:

> [I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

At trial Bianchini never objected to Judge Billings' handling of the jury. He cannot now raise the issue for appellate review. Although the judge did not inform counsel of every development as it unfolded, Bianchini was alerted to the attempted bribery well before the close of defendant's case. He did not demand a mistrial, however, until after the verdicts were returned. When faced with similar situations in the past, "we have [had] no hesitation in rejecting, on waiver grounds, [such] tardily raised claim[s]." *United States v. Bufalino,* 576 F.2d 446, 451 (2d Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978).

The district court has wide discretion to address the effects of unauthorized third party contact on a jury. *See, e.g., Marshall v. United States,* 360 U.S. 310, 312, 79 S.Ct. 1171, 1172, 3 L.Ed.2d 1250 (1959); *United States v. Chang An–Lo,* 851 F.2d 547, 558 (2d Cir.), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *Aiello,* 771 F.2d at 629; *United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.), *cert. denied,* 474 U.S. 944, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). "[W]hether the impact of such contact denied an accused his fundamental right to a fair trial turns on the 'special facts' of each case," facts best left to the judgment of the district court. *Sher v. Stoughton,* 666 F.2d 791, 795 (2d Cir. 1981). Where as here the defendant is also a prime suspect in the government's jury tampering investigation, the trial judge must have the discretion necessary to balance the interest in discovering the truth against the interest of a fair trial. *Cf. United States v. Moten,* 582 F.2d 654, 660–62 (2d Cir.1978).

When first alerted to the bribery attempt, Judge Billings questioned Tenner in chambers, outside the presence of counsel. We have repeatedly sanctioned this approach. *See Bufalino,* 576 F.2d at 451; *United States v. Miller,* 381 F.2d 529, 540 (2d Cir.1967), *cert. denied,* 392 U.S. 929, 88 S.Ct. 2273, 20 L.Ed.2d 1387 (1968). When Tenner reported that he could not remain impartial, Judge Billings replaced him with an alternate juror before the jury began its deliberations. *Cf. Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (allowing tainted juror to participate in verdict creates presumption of prejudice). Following Tenner's dismissal, the judge informed counsel about what had occurred. *See Aiello,* 771 F.2d at 629–30 (advising counsel after voir dire of juror held harmless as long as no prejudice resulted).

In the presence of counsel, Judge Billings then conducted voir dire of the other jurors to determine whether any of them had been exposed to impermissible contact. When two jurors reported that Tenner had spoken with them about the insanity defense, Judge Billings continued voir dire in chambers to determine whether they could remain impartial. *See Chang An–Lo,* 851 F.2d at 558–59 (recommending this approach).

There is no reason to believe that Tenner's dismissal before the jury began to deliberate prejudiced the verdict or that the third-party conduct affected the other jurors. Judge Billings' conduct of the proceedings ensured Bianchini's right to an impartial jury. *Cf. United States v. Ruggiero,* 928 F.2d 1289, 1300 (2d Cir.) (no violation of right to impartial jury when juror's dismissal came *after* jury had already begun deliberations and after he had spoken with other jurors about third-party

contact), *cert. denied,* — U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991).

■ Next, Bianchini argues that Judge Billings erred in refusing to give a jury instruction on the consequences of a verdict of not guilty by reason of insanity. Bianchini claims that the Insanity Reform Act of 1984, 18 U.S.C. §§ 4241–4247, requires such an instruction.

Federal courts usually instruct juries not to consider a verdict's consequences. *See Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) ("the jury [has] no sentencing function and should reach its verdict without regard to what sentence might be imposed"). Judge Billings gave a typical instruction:

> [T]he punishment provided by law for the offenses charged in the indictment or any resulting proceeding ... [including the] result of the plea of not guilty by reason of insanity is a matter exclusively [within] the province of the judge and should never be considered by the jury in arriving at an impartial verdict as to the guilt or innocence of the accused.

The Insanity Reform Act on its face does not compel more, and courts interpreting the Act have usually refused to adopt Bianchini's position. *See, e.g., United States v. Frank,* 956 F.2d 872, 878–82 (9th Cir.1991). *But cf. United States v. Neavill,* 868 F.2d 1000, *vacated, reh'g en banc granted,* 877 F.2d 1394, *appeal dismissed en banc,* 886 F.2d 220 (8th Cir.1989).

The only textual support Bianchini cites for his argument comes from a Senate Committee report that reads:

> [T]he jury, in a case in which the insanity defense has been raised, *may be instructed* on the effect of a verdict of not guilty by reason of insanity. If a defendant requests that an instruction not be given, *it is within the discretion of the court whether to give it or not.*

S.Rep. No. 98–225, 98th Cong., 1st Sess. 240, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3422 (emphasis added). We read this language to leave the instructional decision to the discretion of the district court. We find no abuse of discretion.

■ Finally, Bianchini objects to Judge Billings' method of calculating the amount of marijuana involved for sentencing purposes. To arrive at a figure for sentencing, the judge began with the number of marijuana plants seized during the police searches, estimated the number of plants grown previously, and applied the sentencing guidelines to treat each plant as the equivalent. of one kilogram of marijuana. U.S.S.G. § 2D1.1 (ratio for offenses involving 50 or more plants). Bianchini does not contest the application of the ratio for the growing plants seized during the search, but he contends that the estimates of past growing activity should been based on evidence of weight produced, not plants grown.

Other courts interpreting the ratios have concluded that the intent of the guidelines was "to measure live marijuana by the number of plants and dry leaf marijuana by weight." *United States v. DeLeon,* 955 F.2d 1346, 1350 (9th Cir.1992); *see also United States v. Osburn,* 955 F.2d 1500, 1509 (11th Cir.1992) (recognizing "anomaly" in applying ratio before harvesting and actual weight after harvesting); *United States v. Corley,* 909 F.2d 359, 361 (9th Cir.1990) (live plants measured by number, dried marijuana by weight). We believe this approach best comports with congressional intent in passing its mandatory sentencing provision, 21 U.S.C. § 841(b)(1)(B)(vii), and with the rationale for the corresponding sentencing guideline, U.S.S.G. § 2D1.1.

■ Uncontroverted evidence indicates that Bianchini's farms produced an amount of marijuana substantially less than that used for sentencing. Vermont State Police Detective Sergeant George Contois, Jr., testified on direct examination at trial and on cross examination during an evidentiary hearing that each of the two farms produced 7 to 10 pounds (3.2 to 4.5 kilograms) of marijuana bud per month and that the amounts harvested were certainly less than one kilogram per plant. State witness and co-conspirator Allan Blume testified that one farm produced 6 to 10 pounds (2.7 to 4.5 kilograms) of marijuana per month.

The total dry weight of marijuana produced over the life of the operations, when added to the 3,700 plants actually seized, might support a sentence for 4,000 kilograms. This amount differs materially from the 11,100 kilograms used for sentencing. Because the evidence does not support the finding upon which the district court imposed sentence, we remand for resentencing.

Conviction affirmed and case remanded for resentencing.

JON O. NEWMAN, Circuit Judge, concurring:

On the most significant issue raised by this appeal—whether a jury should be instructed as to the consequences of a verdict of not guilty by reason of insanity—the panel is divided three ways. I believe the instruction should always be given unless the defendant prefers its omission. Judge Winter believes the instruction should normally not be given. Judge Lumbard believes that the decision whether to give the instruction should be left to the discretion of the trial judge. We are in agreement, however, that the omission of the instruction in this case does not require reversal of the conviction. I share that conclusion because I am satisfied that the omission of the requested instruction was harmless error. Though the panel is unanimous in its disposition of this appeal, its division on the issue of giving the requested instruction, if left unresolved, leaves the law of this Circuit unclear.[1]

A court has a paramount obligation to make clear rulings on matters within its jurisdiction. That obligation should weigh especially heavily upon an appellate court whose rulings trial courts are obliged to follow. Much as I would like my view of the law on the giving of the requested instruction to prevail, I feel more strongly that our duty as judges of an appellate court requires us to adjust our differences and formulate a clear rule of law for the guidance of trial courts, if that can fairly be done without violating our oath or our conscience. In this Court, that duty has been recognized on other occasions. *See United States v. O'Grady*, 742 F.2d 682, 694 (2d Cir.1984) (in banc) (Newman, J., with whom Winter and Pratt, JJ., join, concurring) (altering position on "pattern-of-receipt" instruction in Hobbs Act prosecution to avoid even division of in banc court).

I therefore join Judge Lumbard's ruling that leaves the giving of the requested instruction to the discretion of the trial judge, thereby forming a majority position in favor of that approach. Since I am in agreement with Judge Lumbard's disposition of the other issues in this appeal, I concur in the judgment. Nevertheless, I write separately to illuminate the issue for whatever benefit these views might provide both to district judges considering how to exercise their discretion on this matter and to other courts considering the issue in the future.

Whatever the law might have been in an earlier day, it is the sounder course to inform a jury of the consequences of a verdict of not guilty by reason of insanity, now that Congress has provided for mandatory commitment of such defendants. It is also the course endorsed by the Senate Committee on the Judiciary when the Committee reported the bill that established the commitment procedure applicable to such defendants.

Normally, a defendant's disposition after the return of a jury verdict is not a concern of the jury, *see Rogers v. United States*, 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (sentencing). It has long been recognized, however, that this usually salutary principle should not apply to a

---

1. Leaving the three-way division unresolved would not be as intolerable as in circumstances where no majority position for any proposition can be divined. If the division were not resolved, a trial judge, inclined to give the requested instruction, could do so knowing that Judge Lumbard believes he has discretion to do so and I believe he should do so; a trial judge, inclined not to give the requested instruction, could do so knowing that Judge Lumbard believes his discretion includes that course as well and that Judge Winter prefers that course. In my view, that sort of "nose-count jurisprudence," see *In re The Herald Co.*, 734 F.2d 93, 98, n. 3 (2d Cir. 1984), should be avoided.

defendant whose acquittal by reason of insanity will result in his commitment. That exception to the usual practice was recognized in England nearly two hundred years ago, *see Hadfield's Case*, 27 How.St. Tr. 1282, 1355 (1800), and adopted by the District of Columbia Circuit when that Circuit was the only federal jurisdiction in which commitment was an automatic consequence of a verdict of not guilty by reason of insanity ("NGI verdict"), *see Lyles v. United States*, 254 F.2d 725, 728–29 (D.C.Cir.1957) (in banc), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). The view that a jury should be informed of the consequences of an NGI verdict, at least where commitment of the defendant is mandatory, has been endorsed not only by the D.C. Circuit, but also by a panel of the Eighth Circuit,[2] most state courts that have considered the question,[3] and the Criminal Justice Mental Health Standards of the American Bar Association.[4]

Prior to 1984, federal law did not recognize an NGI verdict, and the disposition of those defendants found not guilty after the successful presentation of an insanity defense depended on the vagaries of state civil commitment procedures. *See United States v. Neavill*, 868 F.2d 1000, 1002 (8th Cir.), *vacated upon grant of rehearing in banc*, 877 F.2d 1394 (8th Cir.), *appeal dismissed at defendant's request*, 886 F.2d 220 (8th Cir.1989) (in banc). Upon that state of the law, federal courts outside the District of Columbia followed the traditional practice of disapproving instructions to the jury concerning the disposition of a defendant found not guilty after a successful insanity defense. *See, e.g., United States v. Alvarez*, 519 F.2d 1036, 1048 (3d Cir.1975); *Pope v. United States*, 372 F.2d 710, 731 (8th Cir.1967), *vacated on other grounds*, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); *Pope v. United States*, 298 F.2d 507, 508–10 (5th Cir.1962). That approach recognized the diversion of the jurors' attention that might occur if they were instructed concerning the complexities and uncertain consequences of state civil commitment law. It also benefited the defendant by insulating the jurors from the knowledge that a not guilty verdict after a successful insanity defense might well result in a defendant's being turned loose, *see United States v. McCracken*, 488 F.2d 406, 421–25 (5th Cir. 1974), a consequence that would risk inclining the jury to convict even though entertaining a reasonable doubt about the defendant's sanity.

Federal law concerning the insanity defense was significantly changed in 1984, however, requiring fresh consideration of the appropriateness of informing the jury concerning the consequences of a successful insanity defense. The Insanity Defense Reform Act of 1984, Pub.L.No. 98–473, tit. II, ch. IV, 98 Stat. 2057 (1984), codified at 18 U.S.C. §§ 4241–4247 (1988), made several critical changes. In the first place, a verdict of not guilty only by reason of insanity was authorized. 18 U.S.C. § 4242(b)(3). Second, the insanity defense was narrowed in scope and established as an affirmative defense that the defendant must establish by clear and convincing evidence. *Id.* § 4243(d). Third, and especially pertinent to the issue on this appeal, a mandatory civil commitment procedure was established for every defendant found not guilty by reason of insanity. *Id.* § 4243.

---

**2.** *United States v. Neavill*, 868 F.2d 1000, 1002 (8th Cir.), *vacated upon grant of rehearing in banc*, 877 F.2d 1394 (8th Cir.), *appeal dismissed at defendant's request*, 886 F.2d 220 (8th Cir. 1989) (in banc).

**3.** *Erdman v. State*, 315 Md. 46, 553 A.2d 244 (1989) (instruction should be given whenever requested by defendant); *People v. Young*, 189 Cal.App.3d 891, 234 Cal.Rptr. 819 (1987) (same); *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031 (1979) (same); *Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294 (1975) (same); *Rob-erts v. State*, 335 So.2d 285 (Fla.1976) (instruction must be given unless defendant prefers its omission). *See* Thomas M. Fleming, Annotation, *Instructions in State Criminal Case in which Defendant Pleads Insanity as to Hospital Confinement in Event of Acquittal*, 81 A.L.R. 4th 659, 667 (trend in state courts favors requiring or authorizing instruction on consequences of NGI verdict).

**4.** *ABA Standards Relating to Criminal Justice Mental Health* § 7–6.8 (1984).

Since these fundamental changes in the federal insanity defense, two circuits have reconsidered the pre–1984 practice concerning informing the jury of the consequences of an NGI verdict, and they have reached opposite conclusions. In *United States v. Neavill, supra*, a panel of the Eighth Circuit concluded that the jury should be informed. Though Judge Arnold's opinion was vacated "by operation of law," 886 F.2d at 220, when the Eighth Circuit ordered a rehearing in banc, 877 F.2d at 1394, and Neavill's appeal was ultimately dismissed at his request, 886 F.2d at 220, that opinion remains a persuasive exposition of the arguments for following the practice of the D.C. Circuit. In *United States v. Frank*, 933 F.2d 1491 (9th Cir.1991), the Ninth Circuit chose to adhere to the pre–1984 practice.

Now that Congress has mandated civil commitment for defendants who successfully establish an insanity defense, the jury should be made aware of this important and relevant requirement of federal law. Jurors need not be instructed concerning the consequences of verdicts of guilty or not guilty because they can reasonably be assumed to have a general awareness that a finding of guilty exposes the defendant to the risk of some punishment and a finding of not guilty results in the defendant's freedom. But jurors cannot be expected to know that since 1984 federal law provides automatic civil commitment for those found not guilty by reason of insanity. "[T]he jury has a right to know the meaning of [an NGI verdict] as accurately as it knows by common knowledge the meaning of the other two possible verdicts." *Lyles v. United States*, 254 F.2d at 728.

There is no reason to keep this information from the jurors and every reason to make them aware of it. There is no risk of distracting the jurors from the issues they must decide. The information can be communicated quickly and clearly in a brief sentence, without burdening the jurors with the details of the commitment procedure. The jury can simply be informed that if the defendant is found not guilty by reason of insanity, he will be committed to a suitable facility and not released unless he proves to the court that his release would not create a substantial risk of injury to another person or damage to property due to a present mental disease or defect. *See* 18 U.S.C. § 4243. It might suffice to say only that he will be committed with ultimate release to be determined by the court.

Moreover, on the positive side, communicating the consequence of an NGI verdict guards against the risk that jurors, persuaded that a defendant has established an insanity defense, might nonetheless return a guilty verdict because they do not want the defendant to remain at large in the community. It may well have made sense before 1984 to *protect* the defendant from the risk of an undeserved guilty verdict by keeping the jurors ignorant of the fact that a successful insanity defense would result in the defendant's release from federal custody, *see United States v. McCracken, supra*. It makes no sense now to *expose* the defendant to the risk of an undeserved guilty verdict by keeping the jurors ignorant of the fact that a successful insanity defense would result in his confinement.

The Senate Committee on the Judiciary, in its report accompanying the Insanity Defense Reform Act of 1984, explicitly endorsed the D.C. Circuit's practice of informing the jury that an NGI verdict would result in confinement:

> The Committee endorses the procedure used in the District of Columbia whereby the jury, in a case in which the insanity defense has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity. If the defendant requests that the instruction not be given, it is within the discretion of the court whether to give it or not.

S.Rep. No. 98–225, 98th Cong., 1st Sess. 240 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3422 (footnotes omitted). Judge Lumbard's opinion "read[s] this language to leave the instructional decision to the discretion of the district court." See page 49. I disagree. The Committee's report emphasizes that the district court has discretion whether to give the instruction "[i]f the defendant requests that the instruction not be given." But by "endors[ing]" the "District of Columbia procedure," the Com-

mittee's report makes clear that, unless the defendant objects, the jury must be informed of the consequences of an NGI verdict. The District of Columbia procedure is not discretionary:

> Sometimes a defendant may not want such an instruction given. If that appears affirmatively on the record we would not regard failure to give it as grounds for reversal. Otherwise, whenever hereafter the defense of insanity is fairly raised, the trial judge *shall* instruct the jury as to the legal meaning of a verdict of not guilty by reason of insanity....

*Lyles v. United States,* 254 F.2d at 728–29 (emphasis added) (footnote omitted) (opinion of Prettyman and Burger, JJ.); *id.* at 734 (Bazelon, J., with whom Edgerton and Washington, JJ., join, concurring in part and dissenting in part); *see United States v. Brawner,* 471 F.2d 969, 996–98 (D.C.Cir. 1972) (in banc).[5]

Indeed, it is difficult to understand why one would wish to leave to the trial judge's discretion the decision whether to instruct as to the consequences of an NGI verdict, much less what factors the trial judge is supposed to consider in exercising such discretion. Unless the defendant has objected to the instruction, there is every reason to give it and none to withhold it. Perhaps trial judges in this Circuit, exercising the discretion that the panel majority entrusts to them on this matter, will come to realize that a sound use of that discretion will normally result in giving the instruction.

In this case, I concur in affirming the conviction because the error in not giving the instruction in this case was harmless. That is so because the insanity defense, based on a claim that the defendant suffered from post traumatic stress disorder resulting from combat experience, was insubstantial and the District Judge's instruction contained an oblique reference to what might have been understood to be further proceedings in the event of an NGI verdict. In combination, these factors persuade me that there was no substantial risk that this jury withheld an NGI verdict they might otherwise have rendered for lack of information as to the mandatory commitment that would have followed such a verdict.

Because the omission of the commitment instruction was harmless error, and because I agree with Judge Lumbard's opinion concerning the other issues in the appeal, I concur in the judgment to affirm.

WINTER, Circuit Judge, concurring in the result:

I agree with my colleagues that this matter should be affirmed. In my view, an instruction on the consequences of a verdict of not guilty by reason of insanity should normally not be given.

I agree with Judge Newman that the passage quoted from the Senate Judiciary Committee's report states that the kind of instruction requested by Bianchini should be given and does not leave the issue to the trial court's discretion. The Committee "endors[ed]" the giving of such an instruction and suggested that only a defendant's request "that the instruction *not* be given" (emphasis added) be left to the discretion of the district court. S.Rep. No. 98–225, 98th Cong., 1st Sess. 240 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182 at 3423. However, a statement in a Committee report, however clear it may be, does not have the force of law where the statute itself lacks any relevant provision. *Cf. Knapp v. Commissioner of Internal Revenue,* 867 F.2d 749 (2d Cir.1989) (House Report stating intent of committee not authoritative when not consistent with language of statute). Still, the passage of legislation providing for a mandatory commitment period provides an appropriate occasion for us to reconsider whether the giving of the kind of instruction requested by Bianchini is mandatory. I believe it is not.

The principle that the jury is not instructed as to the sentence that will be meted out to a defendant is a salutary one. The

---

**5.** Because of the Committee's explicit endorsement of the D.C. Circuit's mandatory instructional rule, I agree with Judge Arnold that the use of the word "may" in the passage quoted from the Committee's report must be understood to contemplate the exercise of discretion only when the defendant objects to an instruction, as the report's very next sentence makes clear. *See United States v. Neavill,* 868 F.2d at 1004 n. 3.

likely sentence is not relevant to the jury's task of finding facts and rendering a verdict on criminal liability. In fact, the giving of such an instruction invites juries to ponder matters that are not within their authority and creates a strong possibility of confusion.

The present case nicely illustrates the problem. The instruction requested by Bianchini was as follows:

> If you find the defendant not guilty only by reason of insanity, I instruct you that, under federal law, I must commit him to a suitable facility, and hold a hearing regarding continued commitment. Unless the defendant can establish at that hearing that his release would not create a substantial risk of bodily injury to another, or of serious damage to the property of another person due to a present mental disease or defect, he will remain committed to a suitable facility. He will only be released upon certification that he has recovered from his mental disease or defect to such an extent that his release (which may be conditioned upon a prescribed regimen of treatment and/or medication) no longer creates such a risk. The government may contest any such certification, and request a further hearing before me.

I believe that, if a jury is to be instructed on this matter at all, the proposed instruction would have to be redrafted to inform the jury that an insanity acquittee is entitled to a hearing on his or her mental illness within forty days of the verdict. 18 U.S.C. § 4243(c) (1988). The only mandatory period of confinement, therefore, is the period between the verdict and the hearing, which may be held at any time within forty days. Whether a defendant would find such an instruction helpful seems doubtful to me.

More importantly, I do not think that such an instruction aids jurors in their assigned task. It all but directs them to consider the likelihood of a release date, a matter which, I reiterate, is none of their business. The only conceivable role for such an instruction is to disabuse a jury of the notion that defendants acquitted by reason of insanity are not incarcerated. We should not assume, however, that ju-

rors hold that notion. After all, the nation's most celebrated insanity acquittee, John Hinckley, has been confined for over 10 years. Nor should we assume that the average jury will speculate regarding the consequences of such an acquittal and violate their oaths by acting on that speculation.

Nevertheless, I agree with my colleagues that a district court has discretion to fashion and to give such an instruction in some circumstances. I believe that this discretion is limited to cases in which the trial judge has reason to believe that a particular jury may think that insanity acquittees usually go free and that there is some possibility of the jury's acting on that belief. For example, if a witness or prosecutor made a statement implying that a particular defendant would go free if acquitted by reason of insanity, then a proper instruction on the subject would be appropriate. For another example, if a trial were to take place in the context of a well-publicized insanity acquittee being freed or a freed acquittee committing a well-publicized crime, an instruction would also be appropriate. No such circumstances confront us in the present case.

I therefore concur in the result.